713 A.2d 1068

SUZANNE TURNER, ON BEHALF OF HERSELF AND ALL OTH-
ERS SIMILARLY SITUATED, PLAINTIFFS–RESPONDENTS, v.
FIRST UNION NATIONAL BANK (FORMERLY FIRST FIDELI-
TY BANK, NA NJ, A NATIONAL BANKING ASSOCIATION),
DEFENDANT–APPELLANT.

DANIEL IVERSON, LAWRENCE COHEN, AND TERRI COHEN, ON
BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED, PLAINTIFFS–RESPONDENTS, v. COLLECTIVE
BANK, A FEDERALLY CHARTERED BANK ORGANIZED UN-
DER THE LAWS OF THE UNITED STATES OF AMERICA
(IMPROPERLY NAMED AS COLLECTIVE BANKCORP, INC., A
DELAWARE CORPORATION), DEFENDANT–APPELLANT.

THOMAS KELLY, ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED, PLAINTIFFS–RESPONDENTS, v.
CHASE MANHATTAN MORTGAGE CORPORATION, (A/K/A,
CHASE HOME MORTGAGE CORP.), DEFENDANT–APPEL-
LANT.

Superior Court of New Jersey
Appellate Division

Argued May 19, 1998—Decided July 9, 1998.

34

Before Judges DREIER, KEEFE and PAUL G. LEVY.

*John M. Donnelly,* argued the cause for respondents Turner, Iverson, and Kelly (*Levine, Staller, Sklar, Chan, Brodsky & Donnelly,* and *Schiffrin & Craig,* attorneys; *Arthur M. Brown, Marc Topaz,* and *Mr. Donnelly,* on the briefs).

*Gregory R. Haworth,* argued the cause for appellants First Union National Bank (*Cole, Schotz, Meisel, Forman & Leonard,* attorneys; *Mr. Haworth,* of counsel; *David S. Blatteis* and *Mr. Haworth,* on the briefs).

*Gerald A. Liloia,* argued the cause for appellant Collective Bank (*Riker, Danzig, Scherer, Hyland & Perretti,* and *McCarter & English,* attorneys; *Anthony J. Sylvester* and *Glenn P. Callahan,* on the briefs).

*George E. McDavid,* argued the cause for appellant Chase Manhattan Mortgage Corporation (*Reed, Smith, Shaw & McClay,* attorneys; *Leonard Bernstein* and *Mr. McDavid,* of counsel; *Robert M. Jaworski, Kathleen F. Doran,* and *Mr. McDavid,* on the briefs).

*Dominick A. Mazzagetti,* argued the cause for *amici curiae* New Jersey Bankers Association and New Jersey League of Community and Savings Bankers (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Dennis R. Casale,* of counsel; *Mr. Mazzagetti,* on the brief).

The opinion of the court was delivered by

KEEFE, J.A.D.

This case requires the court to construe *N.J.S.A* 46:10A–6(d), pertaining to a lender's right to pass along its attorney fees to residential borrowers for the review of certain loan documents. These consolidated cases come to us from two Law Division rulings that conflict in their interpretation of the statute. In *Kelly v. Chase Manhattan Mortgage Corp.* and *Iverson v. Collective Bank,* considered together by the same Law Division judge, the judge construed *N.J.S.A.* 46:10A–6(d) to mean that a lender was prohibited from requiring a borrower to pay any fee charged by the lender's attorney, except when the borrower or the borrower's attorney submitted documents that created "extra work" for the lender's attorney. The trial judge also determined that federal regulations did not preempt *N.J.S.A.* 46:10A–6(d) as to defendant Collective Bank, a federally chartered savings and loan association.

In contrast, in *Turner v. First Union,* a different Law Division judge interpreted the statute literally and determined that al-

though a lender may pass along its attorney's fee to the borrower for the review of loan documents submitted "by or at the request of borrower's attorney," no such fee could be required where the borrower is unrepresented by counsel and/or where the borrower himself submits or directs the loan documents to be submitted to the lender.

We hold that *N.J.S.A.* 46:10A–6(d) permits lenders to pass along attorney fees associated with the review of "loan documents," as that term is defined in the statute, regardless of whether the "loan documents" are submitted by or at the direction of the borrower's attorney or the borrower. Thus, we reverse both judgments under review with respect to their interpretation of *N.J.S.A.* 46:10A–6(d). As to the preemption issue, we agree with the Law Division that federal regulations do not preempt state law concerning attorney fees.

## I.

The facts in all of the consolidated matters have been stipulated by the parties. The defendants are lenders licensed and authorized under the laws of the United States and the State of New Jersey to engage in the business of making mortgage loans. The defendants make several thousand loans each year secured by mortgages on real property located in the State of New Jersey. Of the three defendant lenders, Collective is the only lender that is a federally chartered savings and loan association organized under the laws of the United States.

The representative plaintiffs in these consolidated matters all obtained mortgage loans from the defendant lenders. All of the loans were secured by a mortgage on real property located in the State of New Jersey, on which the principal structure is a one-to-four family residence.

As a precondition for receiving the loans from defendant lenders, the plaintiffs were required to obtain title insurance. In addition, each of the defendant lenders required that the plaintiffs pay a review fee, whether they were represented by an attorney

(as in *Iverson* and *Kelly*) or not (as in *Turner*), and to reimburse the lender for attorney fees incurred to review title documents submitted by the plaintiffs. At closing, the lenders' charge for reviewing the loan documents submitted by plaintiffs ranged from $100 to $170.[1] This charge to the borrowers, both represented and not represented by an attorney, was limited to a review of "loan documents," as that term is defined in *N.J.S.A.* 46:10A–6(d).

## II.

*N.J.S.A.* 46:10A–6(d) provides, in relevant part, that

> d. If a loan is made to a person or persons primarily for personal, family or household purposes and is secured by real property located in this State: (1) on which the principal structure is a one-to-four family residence; or (2) on which a one-to-four family residence is to be the principal structure to be constructed with the use of the loan proceeds, the lender shall not require the borrower to reimburse the lender for, or to pay all or any portion of, any fee or expense charged by the lender's attorney *except to the extent of a fee for the review of the loan documents prepared or submitted by or at the direction of the borrower's attorney or such other work or services as requested by borrower or borrower's attorney.* Any other legal fee or expense of the lender's attorney shall be the sole responsibility of the lender.

> For the purposes of this subsection, "loan document" means a promissory note, loan agreement, mortgage, affidavit of title, power of attorney, survey and survey affidavit, title documents and searches and commitments for title insurance and modification of any promissory note, mortgage or loan agreement. (emphasis added)

As clearly demonstrated by the language of the statute, the general rule is that a lender's attorney's fees may not be passed along to the buyer, "except to the extent of a fee for the review of the loan documents prepared or submitted by or at the direction of the borrower's attorney *or* such other work or services as requested by the borrower or borrower's attorney." (emphasis added). The focus of the parties' dispute is the interpretation of the exceptions.

---

[1] In none of the matters do the plaintiffs allege that the amount of the charges were unreasonable; they simply claim that the charges are not permitted under the statute.

Recognizing that the representative plaintiff in *Turner* was not represented by an attorney during the mortgage transaction, the Law Division judge concluded that the statute is "clear and unambiguous ... that a lender may only require a fee when the loan documents are prepared or submitted at the direction of the borrower's attorney, but not when they are submitted by the borrower herself [or himself]." According to the judge, "it is not manifestly absurd or contrary to public policy to find that the Legislature reasonably intended to allow a fee to be charged only when an attorney submits the loan documents." Accordingly, the judge granted plaintiffs' motion for summary judgment.

As in *Turner*, the issue before the Law Division in *Kelly* and *Iverson* was whether the statute permitted lenders to charge attorney review fees. Unlike *Turner*, however, the representative plaintiffs in *Kelly* and *Iverson* were represented by counsel. In addition, in the *Iverson* matter, defendant Collective also presented the issue of whether federal regulations preempted *N.J.S.A.* 46:10A–6(d).

The judge concluded that the statute does not permit lenders to charge borrowers a fee for the review of loan documents submitted by the borrower, regardless of whether the borrower is represented by counsel. According to the judge, the statute only permits lenders to charge review fees where the borrower's attorney prepares or submits documents which create "extra work" for the lender's attorney. For example, the statute would allow lenders to charge a fee for the review of documents if the borrower's attorney submits a different form of the mortgage note than that normally used by the lender. That is so, according to the judge, because the lender's attorney would have to expend additional time and effort to review that document. Where, however, the borrower's attorney merely undertakes the "ministerial act" of gathering title work and submits it to the lender, the judge held that the lender may not charge the borrower any attorney fees associated with the review of such documents. In addition, the judge held that federal regulations do not preempt

*N.J.S.A.* 46:10A–6(d). Accordingly, plaintiffs' motions for summary judgment were granted in both matters.

We granted leave to appeal in all of the matters and consolidated all three cases for review. Subsequently, we granted the motion of New Jersey Bankers Association and New Jersey League of Community and Savings Bankers to participate as *amici curiae*.

## III.

As the Court recognized in its recent decision in *Cornblatt v. Barow*, 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998), the surest indicator of the Legislature's intent is in the language of the statute itself. Thus, " '[i]f the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms.' " *Ibid.* (quoting *State, Dep't of Law and Pub. Safety v. Bigham*, 119 *N.J.* 646, 651, 575 *A.*2d 868 (1990)).

In the context of the mortgage transactions in *Iverson* and *Kelly*, in which the borrowers were represented by counsel, it is clear on this record that the lenders' charge for fees were associated with the review of "loan documents." In fact, this was stipulated to by the parties.[2] Thus, applying the foregoing principle of statutory construction to *Iverson* and *Kelly*, it is clear that the express terms of the statute permit a lender to pass along its attorney's fees to the borrower for the review of "loan documents." This is so whether the "loan document" is simply forwarded to the lender at the direction of the borrower's attorney, in the case of a title search or a survey, or where the borrower's

---

[2] The transcript of the motions for summary judgment in *Iverson* and *Kelly* reveal that the focus of the discussion was on the submission of a title report and survey by the borrower's attorney. It appears obvious that these "loan documents" were specifically argued by the plaintiffs because they are the clearest example of a pure "submission," that does not entail any preparation or drafting on the part of the borrower's attorney. The stipulation of the facts, however, in all the matters simply refer to all "loan documents," as defined in the statute.

attorney drafts or prepares a promissory note or loan agreement. Both are treated the same under the statute, regardless of how much or how little "work" the submission creates for the lender's attorney. The only requirement, under the express terms of the statute, is that the documents "prepared or submitted by or at the direction of the borrower's attorney" fall within the definition of "loan document," as defined in the statute.

Although plaintiffs claim that the word "submitted" is ambiguous, that claim is without merit. A court must interpret the words of a statute based on their "normal and accepted connotations as well as their ordinary and well understood meanings." *State v. Hoffman,* 149 *N.J.* 564, 580, 695 *A.*2d 236 (1997). The word "submitted" means "to send for or commit for consideration, study or decision," or "to present or make available for use or study." *Webster's Third New International Dictionary* 2277 (1966).

The Law Division judge's interpretation of *N.J.S.A.* 46:10A–6(d) in *Iverson* and *Kelly,* therefore, is not in accord with the statute's plain meaning. In reaching the conclusion that "extra work" by the lender's attorney is required to justify an attorney's fee to be paid by the borrower, the judge read the first clause of the exceptions contained in *N.J.S.A.* 46:10A–6(d) entirely out of the statute. While it can be argued that the second clause of the exceptions following the disjunctive "or" creates an "extra work" standard, it is clear that the Legislature did not intend it to stand alone as a basis for the passing through of attorney fees to a borrower. That is so for two reasons. First, it ignores the first clause of the exceptions, and secondly, because subsection c. of the statute requires the lender to disclose in advance "a good faith estimate of any charge which the borrower will be expected to pay to the lender's attorney for ... services...." *N.J.S.A.* 46:10A–6(c)(2). If "extra work" was the only type of attorney fee that could be passed through to the borrower, this section of the statute would be rendered meaningless. A lender could not possibly predict in advance the extra work that a borrower might ask it to perform.

## IV.

The problem, however, with the literal interpretation of the statute arises in the context of an unrepresented borrower. Under a literal interpretation of the statute, the lender's right to charge an attorney review fee simply depends on the identity of the party submitting the loan documents: the "loan documents" must be "prepared or submitted by or at the direction of the borrower's attorney. . . ." Thus, if interpreted literally, a borrower represented by an attorney is required to pay the lender's attorney review fee, while an unrepresented borrower does not have to pay the fee, even though the lender's attorney is performing the same review work. We can ascertain no legislative purpose for this peculiar result.

■ Where, as here, the literal interpretation of a statute produces peculiar or absurd results, a court must interpret the statute "sensibly rather than literally, with the purpose and reason for the legislation controlling." *Reisman v. Great Am. Recreation, Inc.*, 266 *N.J.Super.* 87, 96, 628 *A.*2d 801 (App.Div.), *certif. denied*, 134 *N.J.* 560, 636 *A.*2d 519 (1993). This issue was eloquently addressed by Chief Justice Vanderbilt in *Watt v. Mayor and Council of the Borough of Franklin*, 21 *N.J.* 274, 277, 121 *A.*2d 499 (1956):

> As we move away from the ideal of a clear and unambiguous statute we find statutes that on their face are clear and unequivocal but in light of related legislation and of surrounding facts and circumstances of the case in which it is applicable, the true meaning becomes indefinite or obscure. In these instances it may be the plain meaning of the words themselves that casts doubt as to the true intention of the Legislature, or often it is the absurdity of the result flowing from a literal application of that plain meaning that causes wonder as to the true purpose of the enactment. . . . When these circumstances appear the court is not only at liberty to interpret the statute but it is its solemn duty to seek out and give effect to the legislative intent evident from the aids available to it.

> . . . [I]f a literal application of the statute would create a manifestly absurd result, contrary to public policy, which the Legislature could not have reasonably intended, then the court would be permitted to construe the statute.

### A.

Prior to the 1970s, it was common practice in New Jersey for an attorney to represent both the lender and the borrower in a mortgage loan transaction. The so-called "closed shop" practice allowed lenders to require that borrowers use the lender's attorney for loan closings. The practice was upheld by the Advisory Committee on Professional Ethics (ACPE), *see ACPE Opinion No. 27, reprinted in* 87 *N.J.L.J.* 97 (February 13, 1964), as well as the Supreme Court. *See In re Kamp,* 40 *N.J.* 588, 194 *A.*2d 236 (1963). In *Kamp,* the Supreme Court held that representation of the borrower by the lender's attorney, although constituting double representation, was permitted under the canons of professional ethics so long as disclosure was made to the borrower of the potential conflict. *Id.* at 596, 194 *A.*2d 236; *see also ACPE Opinion No. 119, reprinted in* 90 *N.J.L.J.* 749 (November 16, 1967); *ACPE Opinion No. 100, reprinted in* 89 *N.J.L.J.* 696 (October 27, 1966); *ACPE Opinion No. 51, reprinted in* 87 *N.J.L.J.* 705 (November 5, 1964).

In 1973, Governor William Cahill took the first steps in ending the "closed shop" practice in New Jersey. In his Third Annual Message delivered to the Legislature on January 9, 1973, he spoke of the need to allow borrowers to be represented by an attorney of their choice.

> For many years, it has been accepted practice of some lending institutions to require a prospective borrower to retain an attorney selected by the institution or to require the borrower to pay a legal fee for the institution's attorney to review the transaction as a condition for obtaining a mortgage loan. The selected attorney would often be a member of the board of directors or in some way connected with the institution.
>
> . . . . [While] the institution should certainly have the right to be represented by an attorney of its choice at a mortgage closing[,][w]e must, however, ensure that the borrower also can be represented by the attorney of his choice without being penalized by being required to pay for the lender's legal expenses.

Following Governor Cahill's address to the Legislature, the Governor's Commissioner of Banking, Richard Schaub, proposed Rule 3:1–5.3. Under the proposed rule, a lender would not have been able to charge a mortgagor of a one-to-four family residence

any counsel fees incurred by the lender's attorney, and the borrower would be entitled to an attorney of his own choosing. 5 *N.J. Reg.* 215 (July 5, 1973). The rule, however, was not acted upon before Governor Cahill's term of office ended.

Although no action was taken on the "closed shop" practice during the term of Governor Cahill, Governor Brendan Byrne's administration moved forward with the similar goal of ending the "closed shop" practice of lenders in New Jersey. In 1974, the Assembly introduced Bill No. A–1788. That bill was enacted on July 7, 1975, *L.* 1975, *c.* 145, § 1, and codified as *N.J.S.A.* 46:10A–6. The statute, as originally enacted, provided that "an individual borrower of a loan to be secured by a mortgage on one-, two-, three-, or four-family residence ... shall have the right to be represented in the transaction by an attorney at law of New Jersey of his own selection." The statute, however, did

> not preclude a lender from requiring that documents prepared in connection with a mortgage loan transaction prepared by a borrower's attorney to be submitted to the lender's attorney for examination and review and require the borrower to pay a reasonable fee for such service by the lender's attorney.
>
> [*L.* 1975, *c.* 145, § 1.]

Although there were no statements attached to A–1788 referencing the proposed Rule 3:1–5.3, it is clear that the statute adopted the proposed rule's position that residential borrowers (mortgaging one-to- four family residences) would be entitled to an attorney of their own choosing, but rejected the prohibition found in the proposed rule dealing with the lender's right to charge the borrower reasonable fees for the review of documents submitted by the borrower's attorney.

In 1978, the Legislature amended *N.J.S.A.* 46:10A–6 pertaining to commercial borrowers. The amendment, however, had little impact on the original enactment dealing with residential borrowers. As originally proposed in the Assembly, A–104, the amendment would have prohibited the lender from "requiring borrowers to pay a fee ... for the bank's attorney to review papers prepared by the borrower's attorney." A–104, however, was not enacted. Rather, a different version, initially presented in the Senate (S–

35), was passed by both houses, and did not alter the practice of lenders charging a residential borrower review fees for documents prepared by the borrower's attorney. *L.* 1978, *c.* 65, § 2. The 1978 amendment simply extended the application of the statute to commercial mortgage loans.

In 1987, the dispute over *N.J.S.A.* 46:10A–6 surfaced again as the result of an Opinion issued by the ACPE. In Opinion 608, the ACPE was presented with the question of whether the practice, whereby a lender's attorney would charge a fee to the lender and the lender would then pass along that charge to the borrower, was a violation of the Rules of Professional Conduct. *ACPE Opinion No. 608, reprinted in* 120 *N.J.L.J.* 1112 (December 10, 1987). The ACPE found that such practice was in violation of the Rules of Professional Conduct, explaining that the practice was intended to defeat the purpose of *N.J.S.A.* 46:10A–6 and was unethical. *Ibid.*

Following the release of Opinion 608, the ACPE received numerous requests to reconsider its decision. Accordingly, in a supplemental opinion issued in June of 1989, the ACPE explained its ruling further. *See ACPE Supplement to Opinion No. 608, reprinted in* 123 *N.J.L.J.* 1368 (June 1, 1989). The ACPE included, as part of its opinion, the full inquiry made by the attorney. The question by the attorney was as follows:

> As the lender's attorney, we will perform the title search, provide for insuring title, etc., and we will bill the lender. The lender, in turn, will then bill the borrower for that work. The lender will also advise the borrower that we will close the mortgage for the lender at our office and borrower may get their own counsel to represent them if they so choose. Is this procedure in violation of ethics rules?
>
> [*Ibid.*]

The ACPE analyzed the legislative history, as it understood it to that point, and reaffirmed its initial position that the practice was in violation of the Rules of Professional Conduct.[3] *Ibid.*

> It appears abundantly clear that *N.J.S.A.* 46:10A–6 applies to *all* transactions on which a loan by a bank or financial institution is secured by a mortgage on New

---

[3] Defendant First Union and the *amici* argue that Opinion 608 only applied to "commercial" transactions. We disagree.

Jersey real estate and this includes commercial transactions. The legislation specifically states that lenders may not require a borrower to employ the services of lender's attorney. The lender may require that documents prepared by borrower's attorney be submitted to the lender's attorney for examination and require the borrower to pay the lender's attorney a reasonable fee for such services.

As set forth in *Opinion* 608 as originally published, the procedure proposed in the initial inquiry [where the lender's attorney would prepare the title work, charge the lender, and the lender would in turn charge the borrower for the associated fees] is in violation of the Rules of Professional Conduct.

[*Ibid.* (emphasis in original).]

The ACPE encouraged any party dissatisfied with its interpretation of the statute to seek relief from either the Legislature, to change the statute, or the Supreme Court, regarding the statute's interpretation. *Ibid.*

Opinion 608 drew harsh criticism from the bar. *See* Henry Gottlieb, *Uproar Over Mortgage Fees Ruling, Ethics Decision Bars Banks From Charging For Legal Costs*, 124 *N.J.L.J.* 1 (July 6, 1989). Interested parties dissatisfied with Opinion 608 heeded the ACPE's advice and sought relief in both the Legislature and the Supreme Court. Members of the New Jersey Bar Association and the banking industry petitioned the Supreme Court to review the ACPE Opinion. *See* Henry Gottlieb, *Big Names Go To Bat To Retain Mortgage Fees*, 124 *N.J.L.J.* 5 (September 21, 1989). The Court granted the petition, 118 *N.J.* 193 (1989), and subsequently appointed a Special Master to conduct hearings as to the practices of lenders. At the same time, legislators were lobbied by the banking industry to clarify the statute.

From the time that Opinion 608 was issued, several bills were introduced in the Legislature to amend *N.J.S.A.* 46:10A-6. For example, S-3600 was introduced by Senator Jackman, and would have allowed

an agreement between the lender and the borrowers which permits the lender to charge the borrower the fee charged the lender for any one or more of the following services performed by the lender's attorney:

a. Review of documents prepared by the borrower's attorney in connection with a mortgage loan transaction;

b. The preparation of mortgage loan documents; or

c. *Review of title to the mortgaged property;*

provided that these services are performed for the purpose of ensuring that the mortgage loan is on the terms and conditions required by the lender.

S–3600 was not enacted.

In 1990, S–2801 was introduced, and would have permitted a lender to require a borrower to pay the fees of the lender's attorney for review of "the loan and title documents and other legal services directly related to the loan transaction." S–2801 was not enacted into law.

Finally, in 1992, Assembly Bill No. 1194 was introduced. Specifically with regard to the primary issue raised by Opinion 608, the bill, as introduced, stated:

.... the lender shall not require the borrower to reimburse the lender for, or to pay all or any portion of, any fee or expense charged by the lender's attorney except to the extent of a fee for the review of the loan, title documents and other documents directly related to the loan transaction or such other work as requested by borrower's attorney. Any other legal fee or expense of the lender's attorney shall be the sole responsibility of the lender.

Over the course of a year, A–1194 was modified and enacted in its present form. Under the amendment as enacted, a lender may charge the borrower for

the review of loan documents prepared or submitted by or at the direction of the borrower's attorney or such other work or services as requested by borrower or borrower's attorney.

[*L.* 1993, *c.* 33, § 1.]

Following the enactment of the 1993 Amendment, the Supreme Court issued an order directing the ACPE to publish a Notice to the Bar, stating that Opinion 608 had been superseded by statute, and dismissed the appeal. 133 *N.J.* 415, 627 *A.*2d 1127 (1993).

### B.

There is no legislative statement explaining why the word "borrower" was not included along with "borrower's attorney" in the first clause of the exceptions. We believe, however, that the lengthy history of the development of *N.J.S.A.* 46:10A–6 that we have just recited demonstrates that the clear purpose of the statute has been to provide residential borrowers with the right to

select an attorney of their own choosing, while at the same time providing lenders with the right to charge borrowers for certain legal expenses incurred during the transaction. In our view, the 1993 amendments simply clarify ambiguities that existed in prior versions of the statute regarding the meaning of "prepared" and "loan documents." In that respect, the 1993 amendments clarified that the documents submitted need not necessarily be "prepared," in the sense that they would have to be drafted by the borrower's attorney, but rather that the documents may be of the type that are "prepared" or those that are simply "submitted." Further, the definition of "loan documents" delineates the scope of the fee that the lender could pass through to the borrower.

Plaintiffs make much of the fact that the term "borrower's attorney" was added to the final amendment to A-1194. Undoubtedly, in its introductory form, A-1194 would have allowed for the lender to charge for fees "to the extent of a fee for the review of the loan, title documents and other documents directly related to the loan transaction," without regard to whether the borrower or borrower's attorney submitted those documents. There, of course, can be any number of reasons why the wording of a statute is changed before final enactment. The central question is, however, whether the tortured history of this statute reveals any legislative intent to treat unrepresented borrowers more favorably than represented borrowers.

We believe that the history of the legislation overall is to encourage borrowers to have separate legal representation rather than no representation at all. The statute itself supports our view. *N.J.S.A.* 46:10A-6(b) states: "the lender's attorney represents only the lender and not the borrower *and the borrower is, therefore, advised to employ an attorney of the borrower's choice* ..." (emphasis added). A literal interpretation of *N.J.S.A.* 46:10A-6(d) would encourage borrowers to go unrepresented in real estate transactions, simply to avoid paying the lender's attorney review fees. Such a result is contrary to established public policy as announced by our Supreme Court. "The Court strongly

believes that both parties [involved in a real estate transaction] should retain counsel for their own protection and that the savings in lawyer fees are not worth the risks involved in proceeding without counsel." *In re Opinion No. 26 of the Comm. on the Unauthorized Practice of Law,* 139 *N.J.* 323, 325, 654 *A.*2d 1344 (1995).

Thus, because the legislative history does not support a dichotomy between borrowers represented by an attorney from those that are not, and a literal interpretation of the statute would encourage borrowers to secure residential mortgage loans without the assistance of counsel contrary to public policy as announced by the Supreme Court, the statute must be construed to permit lenders to charge a fee for the review of loan documents prepared or submitted by or at the direction of the borrower's attorney or the borrower.

## V.

Of the three defendant lenders that are parties to this appeal, only Collective is chartered by the federal government. Collective claims that *N.J.S.A.* 46:10A–6 is preempted by federal regulations. Specifically, Collective directs the court to 12 *C.F.R.* § 563.35(d). Although that regulation has been removed from the Code of Federal Regulations pursuant to 61 *Fed.Reg.* 60173 (November 27, 1996), the repeal of the regulation has no affect on the outcome of this case, since the transaction between Iverson and Collective took place while the regulation was still in effect in May 1995.

That regulation provided, in relevant part,

*Payment of attorney's fees by home borrowers.* In connection with a loan on a home (as defined in § 541.14 of this chapter) occupied or to be occupied by the borrower, a savings association or subsidiary thereof may require such borrower to reimburse it for legal services rendered by its attorney, or to directly pay such attorney for such services, only if:

(1) Such attorney's fee is limited to legal services attributable to processing and closing such loan (and not unrelated services performed for the savings association or subsidiary by the attorney);

. . . .

Although Collective recognizes that 12 *C.F.R.* § 563.35(d) ("§ 563.35(d)") did not contain an express preemption clause, Collective argues that § 563.35(d) was incorporated into another section of the Banking regulations, 12 *C.F.R.* § 545.32(b)(5) ("§ 545.32(b)(5)"), which contained an express preemption clause.[4] *See* 12 *C.F.R.* § 545.2.[5] Collective reasons that § 563.35(d) and § 545.32(b)(5), read together, "permit[ted] a federal savings association, such as Collective, to require a borrower to reimburse it for legal fees charged by the association's attorney" and, alternatively, that the intent of the regulations as a whole are "to occupy the entire field of lending operations." Collective relies on *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 *U.S.* 141, 102 *S.Ct.* 3014, 73 *L. Ed.*2d 664 (1982) in support of the latter position.

Collective's argument is flawed with respect to its interpretation of § 563.35(d) and § 545.32(b)(5). Despite Collective's contention, § 563.35(d) was not incorporated in § 545 through § 545.32(b)(5). In fact, § 545.32(b)(5) excepted § 563.35(d) from its scope.

> *Except as provided in § 563.35(d) of this chapter,* a Federal savings association may require a borrower to pay necessary initial charges connected with making a loan, including the actual costs of title examination, appraisal, credit report, survey, drawing of papers, loan closing, and other necessary incidental services and costs, in such reasonable amounts as the board of directors may fix. The Federal savings association may collect the charges from the borrower and pay the persons rendering services. (emphasis added)

Attorney fees were not included in the list of enumerated charges permitted under § 545.32(b)(5). Thus, the regulation pertaining

---

[4] 12 *C.F.R.* § 545.32 has also been repealed. *See* 61 *Fed.Reg.* 50951 (September 30, 1996).

[5] 12 *C.F.R.* § 545.2 provides,

> The regulations in *this part 545* are promulgated pursuant to the plenary and exclusive authority of the Office to regulate all aspects of the operations of Federal Savings associations, as set forth in section 5(a) of the [Home Owner's Loan Act]. This exercise of the Office's authority is preemptive of any state law purporting to address the subject of the operations of a Federal savings association. (emphasis added)

to the recoupment of attorney's fees was not expressly preempted by the provisions of § 545.2.[6]

■ Collective also argues that even if these regulation did not expressly preempt *N.J.S.A.* 46:10A–6(d), that the regulations, interpreted as a whole, imply that the entire field pertaining to lending operations is preempted. It is here that Collective relies on the Supreme Court's decision in *Fidelity Federal.*

In *Fidelity Federal,* the Court reviewed a claim whether regulations promulgated by the FHLBB, permitting federal savings and loan associations to use "due-on-sale" clauses in mortgage contracts, preempted California law which prohibited the use of such clauses. In reaching the conclusion that the federal regulations preempted state law, the Court recognized that "preemption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." 458 *U.S.* at 152, 102 *S.Ct.*

---

[6] Collective cites to several letter opinions issued by the Office of Thrift Supervision ("OTS"), and its predecessor the Federal Home Loan Bank Board ("FHLBB"), to support its position that the regulations "preempt state law attempting to regulate the relationship between federal savings associations and their borrowers." These letter opinions, however, do not support such a position. In fact, all but one of the opinions cited by Collective pertain to specifically preempted areas not relating to attorney fees. The only opinion cited by Collective pertaining to legal services, which coincidentally deals with *N.J.S.A.* 46:10A–6, states, "because the subject matter of the Open Attorney Act [*N.J.S.A.* 46:10A–6] is covered in § 563.35, the provision of that section, rather than state law, would apply to federally chartered institutions." *FHLBB Opinion No. 1544* (May 25, 1977). This, however, does not implicate preemption. In fact, the opinion expressly recognized that

> § 563.35 [did] not purport to 'legalize' any institution's attorney fees or in any way to regulate the practice of law in any State. It provide[d] merely that where an institution requires a borrower to pay the institution's attorney's fees under the circumstances specified in § 563.35(d), the requirements and limitations of that provision must be complied with.
> [*Ibid.*]

The "requirements and limitations" referred to in this opinion refer to the strict notice requirements provided under that provision, which required that the lending institution "[d]escribe[ ] the legal services being performed" and account for all charges. *See* 12 *C.F.R.* § 563.35(d)(2), (3), and (4).

at 3022, 73 *L. Ed.*2d at 675. Furthermore, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Ibid.*

Applying these principles, the Court found that the FHLBB's intent to preempt state law dealing with due-on-sale clauses was "unambiguous." The Court determined that California law was in direct conflict with the federal regulation, because the explicit language in the regulations was intended " 'to have ... due on sale practices of Federal associations governed exclusively by Federal law.' " *Id.* at 158, 102 *S.Ct.* at 3025, 73 *L. Ed.*2d at 678 (citation omitted).

Although Collective argues that *Fidelity Federal* supports its position that the federal regulations completely preempt state law in the area of lending operations, the Court's decision simply does not support that contention. Indeed, the Court specifically declined to broaden its holding to include field preemption, by noting: "Because we find an actual conflict between federal and state law, we need not decide whether ... the regulations occupy the field of due-on-sale law or the entire field of federal savings and loan regulation." *Id.* at 158 n. 14, 102 *S.Ct.* at 3025 n. 14, 73 *L. Ed.*2d at 679 n. 14. Simply because one area of federal regulations expressly preempts state law, it does not mean that the entire field is preempted by implication. This is particularly so when preemptive language only appears in select chapters or provisions of the regulations.

In *Medtronic, Inc. v. Lohr,* 518 *U.S.* 470, 116 *S.Ct.* 2240, 135 *L. Ed.*2d 700 (1996), the Court held that where regulations specifically preempt state law in some areas but not in others, courts should not infer preemption unless the area being preempted is identified by Congress's or a federal regulatory agency's "clear and manifest purpose." *Id.* at 485, 116 *S.Ct.* at 2250, 135 *L. Ed.*2d at 715. In that case, the Court was reviewing the scope of preemption provided in the Medical Device Amendments of 1976(MDA). The MDA merely permitted manufacturers of medical devices that

were "substantially equivalent" to certain pre–1976 medical devices to keep such devices on the market without running the gauntlet of the pre-market approval process. The language of the statute in dispute was: "[N]o State ... may establish ... with respect to a device ... any state requirement ... which is different from, or in addition to, any [federal] requirement...." 21 *U.S.C.A.* § 360k(a).

In holding that the statute did not displace a plaintiff's right under state common law to bring a products liability action against the manufacturer, the Court held that the state common-law claims in that case were not specifically developed "with respect to" medical devices. 518 *U.S.* at 500, 116 *S.Ct.* at 2258, 135 *L. Ed.2d* at 725. Thus, although the MDA did preempt some state law, the intent of the statute was not to preempt state common law claims. *Ibid.* As the Court explained, because the language in § 360k was "less than precise," and considering the presumption against preemption, Congress's silence pertaining to state common law claims led to the conclusion that the state common law claim was not preempted under the statute. *Id.* at 491–502, 116 *S.Ct.* at 2253–58, 135 *L. Ed.2d* at 724–26.

Thus, although the OTS has broad authority to enact regulations to protect the vitality of the federal savings and loan associations and may preempt state law where it deems appropriate to meet that objective, where, as here, the OTB has not chosen to expressly preempt an area, it must be presumed that state law is not displaced. *See De Buono v. NYSA–ILA Med. and Clinical Serv. Fund,* 520 *U.S.* 806, ——, 117 *S.Ct.* 1747, 1752, 138 *L. Ed.2d* 21, 29 (1997) (explaining the presumption against preemption); *see also Medtronic, supra,* 518 *U.S.* at 485, 116 *S.Ct.* at 2250, 135 *L. Ed.2d* at 715.

We further note that the statute, as construed herein, does not conflict with the federal regulations. *See Fidelity Federal, supra,* 458 *U.S.* at 152–53, 102 *S.Ct.* at 3022, 73 *L. Ed.2d* at 675. That is to say, compliance with both the federal regulations and state statute is not a "physical impossibility," and *N.J.S.A.*

46:10A–6(d) does not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal regulations. *Ibid.*

The judgments in all three matters with regard to the interpretation of *N.J.S.A.* 46:10A–6(d) are reversed. We affirm that portion of the judgment in *Iverson* that held that federal regulations do not preempt *N.J.S.A.* 46:10A–6(d).