**WORKERS' COMPENSATION TRUST FUND, Appellant,**

v.

**Phillip SAUNDERS, as Chapter 7 Trustee of the Estate of John J. Petruzzi-William E. Forrester, Inc., Appellee.**

No. 98–40032 RCL.

United States District Court,
D. Massachusetts.

June 11, 1999.

Daniel J. Hammond, Attorney General's Office, Boston, MA, for Appellant.

Melvin S. Hoffman, Looney & Grossman, Boston, MA, for Philip Saunders, Jr.

Daniel I. Cotton, Wolfson, Dodson, Kennan & Cotton, Worcester, MA, for John J. Petruzzi, William E. Forrester Incorporated.

## OPINION AND ORDER

LINDSAY, District Judge.

The Massachusetts Workers' Compensation Trust Fund ("WCTF" or "Fund") has appealed an order of the bankruptcy court which determined that a claim for reimbursement, filed by WCTF against a bankruptcy estate, was not entitled to priority status as an excise tax under the Bankruptcy Code. After considering the parties' arguments, the court AFFIRMS the decision of the bankruptcy court, although on grounds somewhat different from those upon which the bankruptcy court rested its decision.[1] *See In re Parque Forestal, Inc.*, 949 F.2d 504, 510–11 (1st Cir.1991) (affirming, on appeal, a district court's ruling which affirmed, on different grounds, a ruling of the bankruptcy court).

## I. BACKGROUND

The following facts are undisputed.

The debtor, John J. Petruzzi—William E. Forrester, Inc. ("Debtor"), was an earth-moving and excavation company located in Massachusetts. On October 11, 1994, the Debtor filed for reorganization under Chapter 11 of the Bankruptcy Code. The bankruptcy court appointed Phillip Saunders, Jr. as the Chapter 11 trustee. In May 1997, the case was converted to a Chapter 7 liquidation case, with Saunders appointed as the Chapter 7 trustee ("Trustee") of the bankruptcy estate.

Shortly before the original petition in bankruptcy was filed, one Francisco Alves, an employee of the Debtor, suffered an injury at the Debtor's workplace. On the date of the injury, the Debtor did not have

---

1. Actually, this court and the bankruptcy court have reached the same conclusion that the exaction here is not an excise tax, because it is not applicable universally to similarly-situated, potential payors. This court, however, comes to that conclusion by a different route from that taken by the bankruptcy court. Moreover, this court believes that there is reason to question the categorical conclusion, apparently adopted by the bankruptcy court, in its reliance on the decision in *In re Park*, 212 B.R. 430 (Bankr.D.Mass. 1997), *appeal docketed*, No. 97–40205 (D.Mass. Oct. 25, 1997), that revenues derived from the exaction are not applied to the general welfare. *See*, note 2 *infra*, listing various human services uses to which such revenues are put.

workers' compensation insurance coverage through a private insurer; nor was the Debtor otherwise insured. The failure of the Debtor to maintain private workers' compensation insurance or otherwise to provide workers' compensation insurance violated Mass. Gen. Laws ch. 152, § 25A. Alves, therefore, sought payment of his workers' compensation claim from WCTF, which is authorized by Mass. Gen. Laws ch. 152, § 65(2) to make workers' compensation payments to employees of uninsured employers. WCTF paid the claim.

On March 26, 1997, pursuant to Mass. Gen. Laws ch. 152, § 65(8), the Massachusetts Department of· Industrial Accidents ("DIA"), on behalf of WCTF, filed a claim, in the bankruptcy proceeding, for reimbursement of the amount paid to Alves, asserting priority status of the claim against the bankruptcy estate, in the amount of $72,225.92. The Trustee objected and requested that the bankruptcy court reclassify WCTF's claim as a general, unsecured claim.

The bankruptcy court sustained the Trustee's objection. *See In re John J. Petruzzi—William E. Forrester, Inc.* (Bankr.D.Mass.1998) (order entered by Boroff, J. in No. 94–44512–HJB). In denying tax priority status to the reimbursement claim, the bankruptcy court relied on the decision of the bankruptcy court in *In re Park*, 212 B.R. 430 (Bankr.D.Mass.1997) (Queenan, J.); *appeal docketed*, No. 97–40205 (D.Mass. October 25, 1997). That decision held that a claim for reimbursement made by WCTF for workers' compensation benefits paid on behalf of uninsured employers, pursuant to Mass. Gen. Laws ch. 152 § 65(2), did not qualify for priority status under the Bankruptcy Code as an "excise tax," because the exaction was not universally applicable to similarly-situated entities and because revenues derived from the exaction were not applied to the general welfare. *Id.* at 436. Thereafter, the .WCTF filed the present appeal.

## II. MASSACHUSETTS WORKERS' COMPENSATION LAW

Massachusetts has a comprehensive, statutory workers compensation scheme. *See generally* Mass. Gen. Laws. ch. 152 (the "Workers' Compensation Statute"). That scheme requires every employer to maintain workers' compensation insurance; the failure to carry such insurance is a violation of state law. *See* Mass. Gen. Laws ch. 152, § 25A. Massachusetts does not provide a state-administered workers' compensation insurance plan. There is thus no option for an employer to purchase insurance through the state. *See id.* Massachusetts instead allows an employer three options for providing workers' compensation insurance: an employer may (1) purchase insurance through a private insurance carrier; (2) acquire membership in a state-approved workers' compensation self-insurance group; or (3) become licensed as a self-insurer, a procedure requiring, among other things, the posting of a substantial self-insurance bond. *See id.*

The workers' compensation system in Massachusetts has undergone a series of changes since the system was created. *See generally* Nason & Wall, Massachusetts Workers' Compensation Reform Act §§ 1.0–1.1 (1995) (supplementing Locke, Workmen's Compensation (2d ed.1981)); *Daly v. Commonwealth*, 29 Mass.App.Ct. 100, 102–04, 557 N.E.2d 758, 760–61 (discussing 1985 amendments to Mass. Gen. Laws ch. 152, §§ 37, 65). A common complaint concerning the pre–1985 workers' compensation system in Massachusetts was that an injured employee of an uninsured employer was unable to obtain compensation unless he or she brought a personal injury action against the employer. *See* Nason & Wall at § 1.1. Pursuing a tort claim, however, was an inadequate solution for many injured employees because (1) employers were often judgment-proof and (2) a lawsuit did not provide funds necessary for the injured employee's immediate medical care and wage replacement during recovery. *See id.* § 13.1. To address some

of these problems, the Massachusetts legislature enacted what has become known as the Workers' Compensation Reform Act of 1985. *See id.* § 1.2. That legislation, among other things, created WCTF and the Workers' Compensation Special Fund ("WCSF" or "Special Fund"). *See id.* § 1.3(12). These two funds are maintained separately from the state's general revenues. *See* Mass. Gen. Laws ch. 152, § 65(6). The function of WCSF is to pay the operating expenses of DIA. *See* NASON & WALL § 1.3(12). Among the things WCTF was established to do was the payment of approved claims against uninsured employers made by employees injured on the job.[2] *See id.; see also* Mass. Gen. Laws ch. 152, § 65(2)(e). An assessment against employers is the primary source of the revenues for both funds. *See generally* Mass. gen. Laws ch. 152 § 65; *see also* NASON v. WALL § 1.3(12). These reforms of the Workers' Compensation Act of 1985 were intended to provide employees of uninsured employers with the same rights, benefits, and duties under the Workers' Compensation Statute as employees of insured employers. *See id.* § 13.1.

As noted above, WCTF is funded from assessments against employers.[3] *See* Mass. Gen. Laws ch. 152, § 65. The annual amount to be paid by each employer is calculated by a formula, the complications of which need not be set out here. *See id* § 65(4), 65(5). The assessment against an employer is reckoned annually and thus may vary from year to year. Any employer who fails to pay an assessment is subject to a fine of five percent of the overdue

assessment, and the commissioner of DIA may establish a lien on the employer to collect the assessment. *See* Mass. Gen Laws ch. 152, § 65(5).

After WCTF has paid an approved claim to an injured employee, the commissioner of DIA *may* seek to recover from the uninsured employer the amount paid to the employee, as well as any "necessary and reasonable" attorney's fees and costs. *See* Mass. Gen. Laws ch. 152, §§ 65(2), 65(8). There is no particular mechanism prescribed in the Workers' Compensation Statute for the recovery of claims and attorney's fees and costs. Moreover, the claim for reimbursement does not appear to create an automatic lien against a debtor.

## III.  PRIORITY STATUS FOR EXCISE TAXES IN BANKRUPTCY PROCEEDINGS

A.  *What Constitutes an Excise Tax: Anderson, Feiring, Lorber, Suburban I and II and Other Cases.*

The pertinent provisions of the Bankruptcy Code state:

(a) The following expenses and claims have priority in the following order:

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any ex-

---

2.  WCTF also reimburses workers' compensation insurers for some cost of living adjustments, adjustments in delayed disability cases, and for payments made in second-injury or military-service-connected disability cases. WCTF also pays certain vocational expenses of injured workers. *See* Mass. Gen. L. ch. 152, § 65(2); *see also* NASON & WALL § 1.3 (summarizing the effect of § 65(2)).

3.  Certain classes of employers may be exempt from paying the assessment if they file notices of non-participation in the Fund, pursuant to

Mass. Gen. Laws ch. 152, § 65(2). Employers entitled to this option include: private employers with a license to self-insure, private insurance groups, the Commonwealth, public employer self-insurance groups, and public employers with insurance. Upon approval of their notices of non-participation, such employers are not entitled to reimbursement of any workers' compensation benefits paid to their employees by WCTF under § 65(2).

tension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

11 U.S.C. § 507(a)(8)(E).

In this case, the narrow issue presented is whether the reimbursement claims due to WCTF from the bankruptcy estate constitute "excise taxes" within the meaning of § 507(a)(8)(E).[4]

■■■ As Judge Queenan in *Park* pointed out:

The [Bankruptcy] Code does not define "tax" or "excise tax." Whether an obligation is a tax entitled to priority under the Code is a question of federal law. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941); *State of New Jersey v. Anderson*, 203 U.S. 483, 491, 27 S.Ct. 137, 51 L.Ed. 284 (1906); *In re Pan American Paper Mills, Inc.*, 618 F.2d 159 (1st Cir.1980). A state statute's characterization of an obligation as a tax is not dispositive of the true nature of the obligation. *Feiring*, 313 U.S. at 285, 61 S.Ct. 1028. Nor is the statutorily proscribed (sic) remedy dispositive on the issue. *Id.; Anderson*, 203 U.S. at 493, 27 S.Ct. 137. However, courts look to the provisions of the state law giving rise to the claim in order to determine whether the obligation has the incidents of a tax. *See Feiring*, 313 U.S. at 285, 61 S.Ct. 1028; *In re Adams*, 40 B.R. 545, 547 (E.D.Pa.1984). (citations omitted)

*Park*, 212 B.R. at 432–33.

A number of courts have proffered definitions of the term "tax" in the bankruptcy context.[5] The Supreme Court has defined a tax as a "pecuniary burden laid upon individuals or property for the purpose of supporting the government." *New Jersey v. Anderson*, 203 U.S. 483, 492, 27 S.Ct. 137, 51 L.Ed. 284 (1906); *see also United States v. New York*, 315 U.S. 510, 515, 62 S.Ct. 712, 86 L.Ed. 998 (1942) (citing *Anderson*). Refining the *Anderson* definition, the Court has also defined "taxes" as the "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941). These definitions emerge from cases construing § 64 of the old Bankruptcy Act, which awarded priority to all "taxes legally due and owing by the bankrupt to the United States or any State or subdivision thereof." *See id.*

Adopting the principles articulated in *Anderson* and *Feiring*, other courts have added glosses to the Supreme Court's description of what exactions qualify as "taxes" or "excise taxes"[6] for priority purposes

---

**4.** The parties have stipulated that WCTF does not seek recovery from the bankruptcy estate of the unpaid annual assessment that employers are required to pay, but which the Debtor here did not pay. WCTF seeks reimbursement of only the amount it has paid to Alves.

**5.** The First Circuit has articulated a test for defining taxes under the "Tax Injunction Act" or "TIA," 28 U.S.C. § 1341. *See San Juan Cellular Tel. Co. v. Public Serv. of Puerto Rico*, 967 F.2d 683 (1st Cir.1992). The court defined a "classic tax" as one "imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community." *Id.* at 685. At least one court has found the factors in this First Circuit test to be similar to that in *Lorber*, discussed *infra*. *See In re Ludlow Hosp. Soc'y, Inc.*, 216 B.R. 312, 319 (Bankr.D.Mass.1997).

Analysis of the tax status of exactions in the bankruptcy context should not be based solely on this First Circuit definition of taxes, however; for bankruptcy purposes, there exists the additional concern, discussed *infra* in section IV.B, that the purposes of the Bankruptcy Code be considered in deciding whether a particular exaction is a tax.

**6.** An "excise tax" has been defined in various ways. Such a tax has been described as a "privilege tax" arising "upon the voluntary action of the person taxed in performing the act, enjoying the privilege, or engaging in the occupation which is the subject of the excise,

in the bankruptcy context.[7] The Ninth Circuit has fashioned an oft-cited four-prong test that defines a tax as:

(a) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(b) imposed by, or under authority of the legislature;

(c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; [8]

(d) under the police or taxing power of the state.

*County Sanitation Dist. v. Lorber Indust. of Cal.*, 675 F.2d 1062, 1066–67 (9th Cir. 1982) (citing *In re Farmers Frozen Food Co.*, 221 F.Supp. 385 (N.D.Cal.1963)). The requirements of the second and fourth prongs of this test are generally not diffi-

cult to meet by a governmental body seeking to qualify a particular exaction as a tax. Interpretation of the first and third prongs, however, has been the source of much conflicting caselaw.

In *Lorber* itself the court compared two separate assessments levied by the Los Angeles County Sanitation District on residential and nonresidential users of the Sanitation District's sewer system. These assessments funded the Sanitation District's sewer operations. The first assessment was imposed on all users, both residential and nonresidential, and was based on the value of the user's property. The second assessment was an additional surcharge imposed only upon nonresidential users and was set on the basis of the amount of wastewater the user discharged into the system. The nonresidential user

and the element of absolute and unavoidable demand is lacking." 71 AM. JUR. 2D STATE & LOCAL TAXATION § 28 (1973). For a list of descriptions of excise taxes used by several courts, see *Park*, 212 B.R. at 434 (citing, for example, *Patton v. Brady*, 184 U.S. 608, 618, 22 S.Ct. 493, 46 L.Ed. 713 (1902) (citations omitted) (excise tax is an imposition "levied sometimes upon the consumption of a commodity, sometimes upon the retail sale of it, and sometimes upon the manufacture of it.") and *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 487 n. 2 (6th Cir.1994) ("*Suburban II* ") (excise taxes are indirect assessments based on a transaction)).

7. When Congress reorganized the Bankruptcy Act into the Bankruptcy Code, § 64 of the old Bankruptcy Act, which conferred priority on all taxes, was replaced by what is now codified as 11 U.S.C. § 507. The present § 507(8) delineates types of taxes which are to receive priority treatment. For example, both "income taxes" and "excise taxes" are expressly given priority status under this section.
Under recent caselaw, the distinction between an "excise tax" and a "tax" does not appear to be pivotal in the bankruptcy context. Applying the Bankruptcy Act decisions, courts have generally held that exactions qualify for priority status as an "excise tax" as long as they meet the general definition of a tax under the *Anderson*, *Feiring*, and *Lorber* tests (discussed *infra* ). *See Park*, 212 B.R. at 434.

8. This prong depends on whether an assessment is used "for the primary benefit of the payer" or whether the assessments primarily

benefit the general welfare. *See Suburban II*, 36 F.3d at 488–89. The Sixth Circuit refined this prong by additionally requiring that the exaction be (1) "universally applicable to similarly situated entities" and (2) not "disadvantage private creditors with like claims." *Id.* (citing *In re Suburban Motor Freight, Inc.*, 998 F.2d 338 (6th Cir.1993) ("*Suburban I* ")).

Although adopted as an improvement upon the *Lorber* test, the Sixth Circuit's additional requirements articulated in *Suburban II*, like the *Lorber* test itself, have met with abundant criticism. The *Suburban II* requirements have been criticized as creating additional arbitrary elements that do not create meaningful distinctions between taxes and nontaxes. *See, e.g., New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 717 (4th Cir.1989) (Focusing on the view that grants of priority status must not prejudice private creditors with like claims, the court states that "such difference is really only a 'distinction between the sovereign power of the state and the rights of private citizenry.' ") (quoting *State Indus. Comm'n. v. Aebi*, 177 Or. 361, 162 P.2d 513, 517 (1945)). Furthermore, the "universally applicable to similarly situated entities" requirement has been thought to be unhelpful because, depending on how one defines "similarly situated," both fees and penalties also can be universally applied to all similarly situated individuals. *See Park*, 212 B.R. at 437.

received a credit against the *ad valorem* assessment to the extent of its surcharge assessment. The parties to the case agreed that assessments of the first type, collected on an *ad valorem* basis, were taxes. The court held that assessments of the second type, although assessed under the same statutory authority as the *ad valorem* assessments, were not taxes, because they bore the characteristics of a fee for services, triggered by and determined on the basis of the user's "decision" to discharge wastewater into the sewer system. *See Lorber*, 675 F.2d at 1067.

The determination of whether the second assessment was a "tax" turned on two factors: whether the charge was voluntarily incurred by the industrial user and whether a grant of priority status to the exaction conformed with the policy underlying the Bankruptcy Act. Historically, an assessment was found to be "involuntary" if it was a *"non-contractual* obligation imposed by a state statute upon taxpayers who did not consent to its imposition." *Id.* at 1066; *see also Anderson*, 203 U.S. at 492, 27 S.Ct. 137 (contrasting taxes, as levied by the government, with debts which are "obligations ... founded upon contract, express or implied"). Under recent caselaw, however, not all statutorily-created assessments have automatically been deemed involuntary. *See Lorber*, 675 F.2d at 1066–67 (Voluntariness does not depend on the debtor's motivation, but on the "inherent characteristics of the charges".); *In re Belozer Farms, Inc.*, 199 B.R. 720, 724 (9th Cir. BAP 1996) (noting that the contractual-versus-statutory distinction has not been followed by all courts and concluding that "the simple fact that an assessment is authorized by statute does not require a finding that it is 'involuntary' "); *In re S.N.A. Nut Co.*, 188 B.R. 392, 395 (Bankr.N.D.Ill.1995) (citing *In re Jenny Lynn Mining*, 780 F.2d 585 (6th

Cir.1986) (holding that permit fees imposed by statute were not taxes), as examples of "courts under the [Bankruptcy] Code [that] have not hesitated to determine certain assessments to be 'fees,' despite the fact that they stemmed from statutory obligations"). Thus, even though the surcharge in *Lorber* was a statutorily-created assessment, it was held to be voluntary, because its imposition depended on the user's election to discharge wastewater into the sewer system.[9] *See Lorber* 675 F.2d at 1067. The court noted that the classification of the surcharge as a non-tax fee was "a close question," but concluded that because the surcharge was triggered by "voluntary" choice, the surcharge was possessed more of the character of a service fee than that of a tax. *See id.*

The *Lorber* court also held that extending priority status to the surcharge was contrary to the trend of then-recent amendments to § 64 of the old Bankruptcy Act, which tended toward the erosion of the preferred status of taxes. *See id.*, 675 F.2d at 1067–68. The court explained that, following the grant by Congress of priority status to claims for taxes, the federal government and its state and local counterparts began to increase the types and levels of taxation. *See id.* (citing S. REP. NO. 89–1158, in which Congress recognized that the governmental increase in taxation "absorbed greater percentages of the bankrupt's estate"). The court pointed out that Congress had taken note that accelerating taxation and the resulting expansion of the tax priority category tended to undermine the objective of the Bankruptcy Act to promote equitable distribution of the debtor's estate and, in effect, penalized general creditors. *See id.* at 1068. The reaction of Congress, the court said, was to enact a series of amendments to the Bankruptcy Act designed to pare

---

**9.** The court did not make clear what choices a nonresidential user had in the disposal of its wastewater. Indeed, the court specifically declined to consider whether nonresidential users had practical alternatives to using the Sanitation District's sewer system: "[W]e are not free to consider the practical and economic factors which constrained *Lorber* to make the choices it did." *Lorber*, 675 F.2d at 1066.

the numbers and kinds of exactions that qualified for tax priority status. *See id.* In light of the trend the court found to be reflected in changes to the old § 64, the court thought it inappropriate to expand the category of preferred taxes by including in that category the surcharge then under consideration.

### B. *Problems with the Lorber Test*

In practice, application of the *Lorber* test for classifying state-imposed exactions has yielded conflicting results with respect to categorizing the assessments and claims for reimbursements in the workers' compensation context.

In a statutory workers' compensation scheme, there are generally three types of governmental assessments that can be made upon employers: premiums for a state-run insurance fund, direct assessments upon employers by a state fund, and reimbursement claims for monies paid to an injured employee. *See, e.g., In re Payne,* 27 B.R. 809, 815 (Bankr.D.Kan. 1983) (distinguishing the various types of governmental assessments in workers' compensation statutes). "[T]he prevailing rule is that a direct assessment against an employer is an excise tax in bankruptcy." *Id.* at 815 (*citing In re Pan American Paper Mills, Inc.,* 618 F.2d 159 (1st Cir. 1980)); *see also In re Chateaugay Corp.,* 153 B.R. 632, 639 (Bankr.S.D.N.Y.1993). In determining whether premiums and assessments should be classified as taxes, courts have looked at whether a state's workers' compensation scheme allows an employer the option of subscribing to a state-administered insurance plan and whether such a plan is "monopolistic" (that is, the scheme requires payments only to a state-run insurance fund) or allows an employer the additional option of purchasing private insurance or of self-insuring. *See In re Sacred Heart Hosp. of Norristown,* 209 B.R. 650, 655–58 (E.D.Pa.1997) (discussing differences in courts' treatment of workers' compensation payments between states with varying workers' compensation

schemes). Where a system is monopolistic, the premiums or assessments have been held to be taxes, because there are no potential creditors with like claims. *See, e.g., In re Metro Transp. Co.,* 117 B.R. 143, 154 (Bankr.E.D.Pa.1990) (distinguishing Pennsylvania's workers' compensation statute from monopolistic schemes in other states, where "premium payments" were held to be "excise taxes," and holding that premium payments to Pennsylvania's workers' compensation fund were not "excise taxes," because the Pennsylvania statute allowed a self-insurance option).

Characterizations by courts of reimbursement claims, on the other hand, have been mixed. The following courts, applying *Lorber,* (or at least accepting the elements of the *Lorber* test), have held that reimbursement claims were not "excise taxes": *In re Payne,* 27 B.R. at 817 (holding that Kansas' workers' compensation reimbursement claims were not "excise taxes," because the non-tax characteristics of the obligation outweighed the tax characteristics); *In re Chateaugay Corp.,* 153 B.R. at 640–41 (following *Payne* and holding that Minnesota's reimbursement claims were not "excise taxes"); *Suburban II,* 36 F.3d at 488–89 (holding that Ohio's reimbursement claims met the *Lorber* criteria, but were not "excise taxes" because they were not "universally applicable to similarly situated entities" and, in addition, "disadvantaged private creditors with like claims"); *In re Freymiller Trucking, Inc.,* 194 B.R. 914 (Bankr.W.D.Okla.1996) (holding that Oklahoma's reimbursement claims met the *Lorber* and *Feiring* definitions of a "tax," but were not "taxes" under the *Anderson* definition because they were not assessed at a fixed rate). Also applying *Lorber,* the following courts held that reimbursement claims qualified as "excise taxes": *In re Chateaugay,* 1995 WL 656967 (S.D.N.Y. November 8, 1995) and *In re Chateaugay,* 177 B.R. 176, 183–84 (S.D.N.Y.1995) (holding that reimbursement claims were "excise taxes" under *Lorber* ), *rev'g in part,* 153 B.R. 632

(Bankr.S.D.N.Y.1993); *In re Hutchinson*, 135 B.R. 890 (Bankr.D.Ariz.1992); *In re Waldo*, 186 B.R. 118 (Bankr.D.Mont.1995) (following *Lorber* to hold that Montana's reimbursement claims were "excise taxes" and distinguishing that state's workers' compensation scheme from that in *Suburban II* ); *In re Olga Coal Co.*, 194 B.R. 741 (Bankr.S.D.N.Y.1996) (holding West Virginia's reimbursement claims were "excise taxes" under *Lorber, Suburban II*, and the *Chateaugay* district court decision); *In re Hynes*, 229 B.R. 405 (Bankr.W.D.Mich. 1998) (holding that Michigan reimbursement claims were "excise taxes" under both *Lorber* and *Suburban II* ).

Even courts in the Ninth Circuit, purporting to apply the *Lorber* test, have reached conflicting conclusions on the issue. The history of *In re Camilli* illustrates the point. The bankruptcy court originally held in that case that Arizona's reimbursement claims were "excise taxes." *See* 182 B.R. 247, 249 (9th Cir. BAP 1995). The Ninth Circuit Bankruptcy Appellate Panel ("BAP") reversed this decision and held that the claims were not taxes. *See id.* at 251. First, the BAP found that the reimbursement claims were analogous to the "voluntary" surcharges at issue in *Lorber*, because the reimbursement claim arose from Camilli's choice not to obtain workers' compensation insurance. *See id.* The BAP agreed with the court in *Payne* that the claims were more analogous to a voluntary contract for subrogation than to an involuntary "tax." *See id.* Second, following the reasoning in *Suburban II*, the BAP concluded that granting priority status to the claim would disadvantage private insurers. *See id.* The Ninth Circuit then reversed the BAP's decision and held that the reimbursement claims were "taxes" entitled to priority status. *See In re Camilli*, 94 F.3d 1330, 1335 (9th Cir.1996), *rev'g* 182 B.R. 247. The court held that the obligation of an uninsured employer to reimburse Arizona's Special Fund for claims paid to an injured employee was involuntary because it was imposed by statute and could not constitute a contrac-

tual debt. *See id.* at 1333. The court also held that the BAP's application of the *Suburban II* "universally applicable to similarly-situated entities" factor was erroneous under the Arizona workers' compensation system. The court concluded that private insurance carriers were not similarly situated to the Special Fund because the Special Fund was given authority to "exercise its police power to protect employees injured on the job," and thus there were no private creditors with similar claims who could be disadvantaged. *Id.* at 1332, 1334.

As the foregoing collection of cases demonstrates, application of the *Lorber* test in the area of workers' compensation reimbursement claims can·produce strong arguments both for and against the classification of such claims as excise taxes. This court is hardly the first to note this problem with the *Lorber* test. *See, e.g., Suburban I*, 998 F.2d at 341 (observing that "all money collected by the Government [i.e., no matter how denominated] goes toward defraying its expenses and is used for public purposes. The threat of the *Lorber* reasoning, then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments"); *Suburban II*, 36 F.3d at 488 (concluding that the *Lorber* test did not "limit in any meaningful way the circumstances under which government claims would be entitled to priority"); *In re Park*, 212 B.R. at 433–35 (noting that the *Lorber* test has been criticized as insufficient to distinguish taxes from other types of payment to the government, such as fees for service or criminal and civil penalties, and contending that the voluntariness prong is inappropriate for determining "excise tax" status of an exaction because "excise taxes" cannot be voluntarily incurred); *In re Freymiller*, 194 B.R. at 916 (stating that under the *Lorber* test, a judgment to the government for the collection of a debt would qualify as a tax even though "[n]o one ... would reasonably

conclude that [such] judgments ... are 'taxes' ").[10]

Given the problems with the *Lorber* test, the court agrees with WCTF that it would not be appropriate to apply that test in the context of the workers' compensation reimbursement claim here. Accordingly, the court will return to the source, as it were, and eschewing any substantial reliance on *Lorber,* the court will take a closer look at those cases of the Supreme Court that define the term "tax" in the bankruptcy setting.

C. *The Supreme Court's Approach in Determining Excise Tax Status of Governmental Claims in the Bankruptcy Context*

■ In determining whether an exaction is a "tax" and thus should be granted priority status, the Supreme Court's approach can best be characterized as determining whether the exaction (1) meets the general description of a tax and (2) possesses other "tax characteristics," [11] such that the exaction operates as a " 'tax' (as distinct from a debt or penalty) for the purpose of setting the priority of a claim under the bankruptcy laws." *U.S. v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 220, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) ("*CF & I* "). In addition, when the issue is whether an exaction should be accorded priority status as a tax, the policies underlying the Bankruptcy Code must be considered. *See Feiring,* 313 U.S. at 285, 61 S.Ct. 1028 ("[W]e look to the terms and purposes of the Bankruptcy Act as establishing the criteria upon the basis of which the priority is to be allowed.")

■ As noted earlier, in *Anderson,* the Supreme Court described a tax generally as a "pecuniary burden laid upon individuals or property for the purpose of supporting the government." 203 U.S. at 492, 27 S.Ct. 137. In addition, the Court held that a "tax" had the following attributes: (1) consent of the payor to the exaction was unnecessary; (2) the amount of the exaction was fixed by statute; and (3) all payors within the statutory class were required to pay the exaction. *See id.* at 492–93, 27 S.Ct. 137.

In *Feiring,* the court followed *Anderson* and held that the exaction there was a tax, because it was a "pecuniary burden ... laid upon the bankrupt seller for the support of the government, and without his consent." *Feiring,* 313 U.S. at 287, 61 S.Ct. 1028. Although the Court did not explicitly state that the three tax characteristics mentioned in *Anderson* were present, examination of the exaction confirms that they were. The exaction was imposed by statute upon all sellers of personalty, and the consent of the payors of the exaction was unnecessary to the imposition of the exaction.

In *CF & I,* the Supreme Court concluded that while a ten percent exaction on accumulated funding deficiencies of certain pension plans, imposed pursuant to 26 U.S.C. § 4971, may have met the general description of a "tax," the exaction was not a "tax," because the exaction was more akin to a penalty. 518 U.S. at 224, 116 S.Ct. 2106 (quoting general description of a tax as stated in *Anderson,* 203 U.S. at 492, 27 S.Ct. 137 and *United States v. New York,* 315 U.S. 510, 515, 62 S.Ct. 712, 86 L.Ed. 998 (1942)). After citing the *Anderson* description, the Court consid-

---

**10.** The conflicting decisions may result from the failure of some courts employing the four-prong *Lorber* test to address, in addition, the critical question of whether a grant of priority status to a governmental claim meets the purposes and policy undergirding the Bankruptcy Code. *See, e.g., In re Hutchinson,* 135 B.R. 890 (Bankr.D.Ariz.1992) (holding reimbursement claims were "excise taxes" under the

*Lorber* test without addressing the Bankruptcy Code's central policy of equal distribution).

**11.** These "tax characteristics" may refer to two phases of the taxation process: the levying or imposition of the tax and the collection or enforcement of the tax levied. *See* 71 Am. Jur. 2d State & Local Taxation § 1 (1973).

ered whether the exaction resembled more an "enforced *contribution* to provide for the support of the government" or a "penalty ... an exaction imposed by statute as punishment for an unlawful act." [12] *See id.* In *CF & I*, the court concluded that the penal nature of the exaction alone was a sufficient non-tax characteristic to disqualify the exaction as a tax.[13]

## IV. WCTF's REIMBURSEMENT CLAIM

■ WCTF urges the court to grant priority status to its claim because the claim, in WCTF's view, meets the *Anderson* and *Feiring* definitions of a "tax," as rearticulated in *CF & I*. For reasons explained in the following sections, the court disagrees with WCTF. Applying the *Anderson, Feiring,* and *CF & I* tests, the court concludes that the reimbursement claim here is not a "tax" because it does not possess sufficient "tax characteristics," and, in addition, a grant of priority status would violate the Bankruptcy Code's guiding principle of equal distribution.

### A. *Non–Tax Characteristics of § 65(8) of the Workers' Compensation Statute.*

The Trustee argues that a claim for reimbursement by WCTF under the Workers' Compensation Statute does not have the attributes of a tax, because the

collection of the exaction is discretionary.[14] The court agrees.

■ One important characteristic of a tax is that it must apply uniformly across the universe of persons to whom it is directed. *Anderson,* 203 U.S. at 493, 27 S.Ct. 137 (noting one tax characteristic of the exaction in question in that case was that all corporations were required to pay it); *Suburban II,* 36 F.3d at 488–89 (requiring that exactions be "universally applicable to similarly situated entities" to qualify as an "excise tax" for bankruptcy priority purposes).[15] Section 65(8) states: "If the trust fund pays compensation to a claimant pursuant to clause (e) of subsection (2), it *may* seek recovery from the uninsured employer for an amount equal to the amount paid on behalf of the claimant under this chapter, plus any necessary and reasonable attorney fees." Mass. Gen. Laws ch. 152, § 65(8) (emphasis added). By its terms then, this provision allows for different treatment among the members of the class of uninsured employers for whom the WCTF pays claims, depending on how the commissioner of DIA exercises his discretion— that is, whether he elects or declines to pursue a particular uninsured employer for whom WCTF has paid a claim. The statute gives no guidance as to when a reimbursement should be sought from a qualifying employer. Nor does the statute appear to prohibit the commissioner from seeking full reimbursement in some cases and partial reimbursement in

---

**12.** This approach— the determination of whether the non-tax characteristics predominate over the tax characteristics— appears to have been a necessary refinement of the *Anderson* tax definition because the exaction in *CF & I* had both tax and non-tax characteristics.

**13.** The Court noted the pervasive penal character of the statute creating the exaction and the penal character reflected in the statute's legislative history. *See CF & I,* 518 U.S. at 225–26, 116 S.Ct. 2106.

**14.** The Trustee makes other arguments as well, but the court finds persuasive only the argument discussed in the text above.

**15.** Indeed, an exaction that otherwise qualifies as a tax, but that creates arbitrary and irrational classes of taxpayers or fails to treat equally taxpayers within the same class may run afoul of the Fourteenth Amendment. *See Hopkins v. Southern Cal. Tel. Co.,* 275 U.S. 393, 403, 48 S.Ct. 180, 72 L.Ed. 329 (1928) ("[T]he Fourteenth Amendment protects those within the same classes against unequal taxation; all are entitled to like treatment."); *Cf. New Neighborhoods, Inc.* 886 F.2d at 720–21 (citing *Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940) (citations omitted) and recognizing that the presumption of constitutionality of a tax may be overcome if the exaction is palpably arbitrary).

others. In sum, under § 65(8), collection in full of the exaction may be sought from some, but not all, persons or entities subject to the imposition of the obligation. Thus structured, § 65(8) does not have uniform application within the class of those subject to its provisions. This attribute alone disqualifies WCTF's claim under § 65(8) from classification as a tax.

### B. *The Principle of Equal Distribution.*

■ There is another reason, however, for treating claims under § 65(8) as nontax claims. As noted above, *Feiring* teaches that the policies of the Bankruptcy Code establish the criteria upon which priority status of a claim is to be determined. 313 U.S. at 285, 61 S.Ct. 1028. Giving tax priority to WCTF's reimbursement claim here would enervate the Bankruptcy Code's central policy of equal distribution among similar creditors. *See Lorber*, 675 F.2d at 1067–68; *New Neighborhoods*, 886 F.2d at 718–19 (noting the need to limit priority claims in bankruptcy); *Suburban II*, 36 F.3d at 487 (holding that courts should give due consideration to the premise that "equality of distribution among creditors is a central policy of the Bankruptcy Code") (citing *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)). The court agrees with the *Suburban II* court that a separate requirement of the definition of a tax, for priority purposes under the Bankruptcy Code, is that priority status for the exaction should not disadvantage private creditors with similar claims. *See Suburban II*, 36 F.3d at 488; *see also Park*, 212 B.R. at 436 (analyzing prejudice-to-private-creditors factor in the context of the Massachusetts workers' compensation system).[16]

The reimbursement claim here is of a type not unique to the Commonwealth, and if treated as an excise tax, the claim would disadvantage similar claims of potential private creditors. Such a potential creditor is the injured employee whose claim arises while the debtor is a self-insurer. *See, e.g., In re Columbia Packing Co.*, 34 B.R. 403 (Bankr.D.Mass.1983) (denying priority tax status to workers' compensation claims arising while debtor was a self-insurer). The following is a possible scenario. Employee A suffers a work-related injury at a time when Employer is self-insured. He files a claim and the claim is not paid at all, partially paid, or results in periodic payments. Employer's self-insurance bond is insufficient to cover the claim. Employer ceases to self-insure and does not otherwise obtain insurance for workers' compensation claims. *Id.*, at 404 n. 1. Employee B is then injured. His claim is approved and paid by WCTF. Employer then seeks relief in bankruptcy. Employee A files a claim for his unpaid benefits. WCTF (essentially a statutory subrogee of Employee B) also files a claim for reimbursement of what it has paid in benefits to Employee B. If WCTF's claim is treated as a tax, that claim will achieve priority over the claim of Employee A, even though both claims derive from a similar source: a work-related injury to an employee. The foregoing sketch demonstrates the potential for disparity among similar creditors if WCTF's claim here is given tax priority status. Such disparity renders the exaction here unlike those held to be taxes in *Anderson* and *Feiring* and is at odds with the principle of equal distribution.

### IV. CONCLUSION

Because claims under § 65(8) may be pursued as to some employers subject to its provisions and not to others, such claims fail the uniform-application characteristic of a tax. Moreover, granting tax priority in bankruptcy of such claims would undermine the Bankruptcy Code's policy of equal distribution, because priority status would prejudice private creditors with like claims. For these reasons, the

---

16. Unlike the *Park* court, however, this court holds that granting priority status to reimbursement claims made by the WCTF would disadvantage private creditors.

court holds that a claim under § 65(8) is not an excise tax and not entitled to priority status. Accordingly, the order of the bankruptcy court is AFFIRMED.

SO ORDERED.