575 A.2d 868

STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF MOTOR VEHICLES, APPELLANT, v. CYNTHIA K. BIGHAM, RESPONDENT.

Argued January 2, 1990—Decided June 28, 1990.

*Todd A. Wigder*, Deputy Attorney General, argued the cause for appellant (*Peter N. Perretti, Jr.*, Attorney General of New Jersey, attorney; *Michael R. Clancy*, Assistant Attorney General, of counsel).

*William J. Bigham* argued the cause for respondent (*Hannoch Weisman,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

Respondent, Cynthia Bigham, was involved in an automobile accident. Not being at fault, she was charged only for driving with an expired license, to which she pled guilty and paid a small fine. Because of that conviction, she was also required to pay an automobile insurance surcharge of $100 per year for three years. The surcharge was imposed by the Division of Motor Vehicles under a regulation adopted by the Commissioner of Insurance pursuant to the Merit Rating Plan of the New Jersey Insurance Reform Act of 1982. The issue presented by this appeal is whether such a surcharge on persons convicted for driving without a valid license exceeds the authority of the statute and is therefore invalid.

I.

On July 8, 1985, respondent, who had an unblemished driving record, was involved in an automobile accident. When the police arrived, she produced a driver's license that had expired six months previously. As a result she was charged under *N.J.S.A.* 39:3–10 with driving with an expired license. Respondent claimed that she had not received a renewal notice from the Division of Motor Vehicles ("DMV") and was unaware that her license had expired. Nonetheless, on July 22, 1985, she pled guilty to the charge and was fined ten dollars. The Municipal Court notified the DMV of that conviction. Thereafter, pursuant to *N.J.A.C.* 13:19–13, the DMV mailed an insurance surcharge bill to respondent charging her $100 per year for three years.

Bigham requested a hearing, and, after an unsuccessful settlement conference, the matter was transferred to the Office of Administrative Law. The Administrative Law Judge con-

sidered the matter on the record without testimony, and concluded that the surcharge was invalid. He believed that the purpose of the New Jersey Insurance Reform Act was to "set up a merit rating plan and an accident surcharge system in order to penalize poor drivers and to ensure that automobile insurance will be more equitable to the motorists of New Jersey," and that unknowingly driving with an expired license was not sufficiently serious to justify such a surcharge. The Director of the DMV ("Director") rejected that decision, construing the surcharge scheme as nonpenal in nature and automatic on conviction of covered violations. The Director confirmed the surcharge and suspended respondent's driving privileges indefinitely until it was paid.

The Appellate Division reversed the Director, determining that *N.J.A.C.* 13:19–13.1 exceeded the authority of the Act and that Bigham's conviction under *N.J.S.A.* 39:3–10 could not trigger a surcharge. The court reasoned that the non-point offense of driving with an expired license, as opposed to driving without ever having been licensed, did not sufficiently implicate safety concerns and was therefore not the kind of offense. contemplated by the Legislature in establishing the Merit Rating Plan under the Act. Accordingly, it ruled that the regulation was invalid as applied to a safe driver such as respondent.

This Court granted the DMV's petition for certification, 114 *N.J.* 512, 555 *A.*2d 627 (1989), to consider whether the regulation adopted by the agency providing for an insurance surcharge for the offense of driving without a license is authorized by the Act and whether its application in this case to a driver charged only with driving with an expired license and not otherwise guilty of additional offenses entailing unsafe driving is valid.

## II.

The Insurance Reform Act of 1982, *N.J.S.A.* 17:29A–33

to –47 ("Act"), was in effect at the time this dispute arose.[1] That 1982 legislation altered the mode of complying with the statutory compulsory-insurance mandate by replacing the then-existing Assigned Risk Plan with the Full Insurance Underwriting Association ("JUA"). The primary objective of the JUA was to extend automobile insurance to those drivers unable to obtain it in the voluntary market. The legislative scheme also sought to reduce insurance inequities by replacing premium surcharges previously assessed by private insurance companies with the New Jersey Merit Rating Plan. Under the Merit Rating Plan, the DMV levied fees on all drivers who accumulate six or more points for motor vehicle offenses under Title 30 or are convicted of drunk driving under *N.J.S.A.* 39:4–50 or a similar offense in another jurisdiction. *N.J.S.A.* 17:29A–35b(1), (2). The Act was amended in 1984, however, to authorize the Commissioner of Insurance ("Commissioner") to impose surcharges for motor-vehicle violations for which points do not attach. *L.*1984, *c.* 1, § 2; *N.J.S.A.* 17:29A–35b(3)(b). Pursuant to that amendment, the Commissioner, in consultation with the Director of the DMV, promulgated *N.J.A.C.* 13:19–13.1, specifically imposing surcharges on persons convicted under *N.J.S.A.* 39:3–10, driving a motor vehicle on the public highways without a valid license, a non-point violation. The regulation provides for assessment of that surcharge annually for a three-year period. *N.J.A.C.* 13:19–13.2.

█ In determining whether the Commissioner exceeded the statutory grant of authority, we are remitted first to the language of the statute. As we said recently in *State v. Churchdale Leasing*, 115 *N.J.* 83, 101, 557 *A.*2d 277 (1989), "[w]hen a statute is clear on its face, a court need not look beyond the statutory terms to determine the legislative intent."

---

[1]The Act has since been replaced with the Fair Automobile Insurance Reform Act of 1990, effective March 12, 1990. That legislation preserves the Merit Rating Plan and the specific enabling provisions at issue in this case. *L.*1990, *c.* 8, § 35.

*See State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). If the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms. *Sheeran v. Nationwide Mut. Ins. Co.,* 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979).

The DMV contends that the language of the Reform Act of 1982, as amended in 1984, is plain and unambiguous, and clearly reveals legislative meaning and purpose. The express language of *N.J.S.A.* 17:29A–35b(3) states that such an insurance surcharge can be imposed "for motor vehicle violations or conviction for which motor vehicle points are not assessed under Title 39." That statutory language, the State maintains, indicates that motor-vehicle violations that do not carry point assessments, and do not implicate safety as such, can be the basis for a surcharge as determined by the Commissioner after consultation with the Director. *N.J.S.A.* 17:29A–35b(3). Because of the broad and unqualified description of the motor-vehicle violations encompassed within the Merit Rating Plan, the DMV contends that the Legislature granted the Commissioner the authority to impose surcharges for non-point offenses that may not involve safety.

The Appellate Division acknowledged that the statutory language does not describe predicate violations in terms of whether they involve or implicate driving safety. It nevertheless reasoned that an interpretation that fails to recognize such a qualification is contrary to the legislative intent and purpose. The Appellate Division reasoned that other surchargable offenses expressly identified in the Merit Rating Plan could be said to implicate safety. Such offenses are appropriately the basis for insurance surcharges because they directly engender insurance claims and thus relate to the generation of higher operating costs for the JUA. Assuming then that failure to renew a driver's license is unrelated to safety, and is thus a non-cost-related offense, the Appellate Division determined that such an offense would not fall within the class of violations of the enabling provision, *N.J.S.A.* 17:29A–35b(3). We are not

persuaded, however, that the legislative intent underlying the statute is one that focuses inexorably and exclusively on offenses directly implicating traffic safety, and hence we find no basis for concluding that the statute impliedly limits surchargable violations only to those involving traffic safety.

A review of the legislative history of the Act is instructive in determining legislative intent. *State v. Wright,* 107 *N.J.* 488, 496–97, 527 *A.*2d 379 (1987); *State v. Madden,* 61 *N.J.* 377, 389, 294 *A.*2d 609 (1972). An appreciation of the defects in the previous system that the Act sought to remedy contributes to an understanding of the objectives of the Legislature and of the policies underlying passage of the Act. *See DeFazio v. Haven Sav. & Loan Ass'n,* 22 *N.J.* 511, 518–19, 126 *A.*2d 639 (1956). Under the former Assigned Risk Plan, which was often the only available insurance for statistically-categorized "high risk" drivers, these residual market insureds were often charged abnormally high rates. The Chairman of the Ad Hoc Committee on Automobile Insurance prefaced a report issued in 1979 by identifying the inequities of the current system: "under the present system of auto insurance there are male drivers living in New Jersey who pay $1,795.00, while their twin sisters living in another part of the state, with the same insurance coverage, and the same good driving record, pay $245.00. This is not fair." *See Ad Hoc Committee Report on Automobile Insurance Reform in the State of New Jersey,* Chairman's Report, 23–25 (January 3, 1979) (hereinafter "Chairman's Report"). In addition to premiums pegged at high rates, incremental insurance costs in the form of surcharges were imposed by private insurers on drivers in both the voluntary and residual market. Those surcharges were levied for violations of the motor-vehicle laws on New Jersey insureds in a seemingly *ad hoc* manner, with the amount often based on company-set percentages of base insurance premium rates. Those rates in turn were based on driver classification or geographical location. *Ibid.* The Chairman explained:

> There are two inequities in the present surcharge system. Insurance points are levied for minor violations or accidents, and surcharges are levied haphazardly in the voluntary market. For example, some companies surcharge in the voluntary market for very minor violations and accidents, and others charge only for major violations or accidents. This creates a situation in which two drivers with the same accident and violation record might be treated very differently in terms of the amount of surcharge [insurance points] which they are required to pay.
>
> [*Id.* at 23–24.]

As noted, in the enactment of the New Jersey Insurance Reform Act of 1982 and the JUA, the Legislature sought more fairly and economically to issue insurance coverage for those drivers unable to obtain it in the voluntary market due to "high risk" classification by conforming rates to industry averages. *See N.J.S.A.* 17:29A–34 ("It is the intent and purpose of this act: * * * [t]o require that automobile insurance rates charged any insured shall not exceed certain average rates, as determined in the act."). The sponsors of the Act explained:

> The purpose of this bill is to make automobile insurance available in a more equitable way for suburban and urban motorists while granting insurance companies the opportunity to make a reasonable profit. The reforms to the automobile insurance system mandated in this bill will be achieved without any good driver paying higher rates and with at least a 5% reduction in the rates of senior citizens.
>
> [Senate Labor, Industry and Professions Committee Statement, *L.*1983, *c.* 65, *reprinted at N.J.S.A.* 17:29A–33.]

The sponsors further suggested that widespread coverage at reasonable rates would be obtained by leveling the rates for residual insureds and recouping JUA losses through the surcharge system. *Ibid.* As then-Governor Kean also explained, "[t]his law will make our automobile insurance system more equitable by flattening taxes and administrative fees, and by instituting a surcharge system for bad drivers." Statement by Hon. Thomas H. Kean, *L.*1983, *c.* 65.

The surcharge scheme of the Merit Rating Plan was designed to provide the necessary funding for the JUA and to alleviate disparate surcharges by implementing a uniform dollar scale to be levied for violations of motor-vehicle laws. *See Clark v. New Jersey Div. of Motor Vehicles,* 211 *N.J.Super.* 708, 710,

512 *A.*2d 588 (App.Div.1986) ("The Merit Rating Plan merely gives the Division of Motor Vehicles the responsibility of assessing surcharges for high risk drivers in a uniform manner, as opposed to the area-based industry surcharge previously in existence."). The sponsors explained that the Plan was intended to establish a "uniform merit rating surcharge system based on certain criteria [so that] surcharges will no longer vary by classification of motorists or on the basis of residency." *See* Karcher, *Overview of No–Fault Auto Insurance,* 111 *New Jersey Lawyer: Journal of the New Jersey State Bar Association,* 9 (May 1985) ("It should be noted that the Reform Act does not create new surcharges for motor vehicle convictions and accidents; it reforms the surcharge system previously used by the insurance companies. It is to be uniform within each company with regard to the classification of the insured or where the insured resides."). To the extent that monies collected from all sources, including the surcharge scheme, were insufficient to offset losses sustained by the JUA, the Act permitted a residual market equalization charge to be levied on virtually every insured vehicle in the state, effectively shifting some of the financial burden of residual insurance to all drivers in the State. See Senate Labor, Industry and Professions Committee Statement, *L.* 1983, *c.* 65.

Under the Merit Rating Plan New Jersey insureds are surcharged equally for comparable Title 39 violations and overall driving records. *N.J.S.A.* 17:29A–35b specifies minimum amounts for surcharges to be levied on drivers who accumulate six or more motor-vehicle points for each year the driver possesses such points, and on persons convicted of DWI annually for a three-year period. *N.J.S.A.* 17:29A–35b(1), (2). The Commissioner is authorized to set and to modify the actual amounts of the surcharges. *Ibid.* As noted, the amendment to the Act in 1984 also granted the Commissioner the authority to impose surcharges based on motor-vehicle violations or convictions that do not carry point assessments. *N.J.S.A.* 17:29A–35b(3)(b); *see L.*1984, *c.* 1, § 5. Moreover, the legislation con-

tained a broad enabling clause that authorized the Commissioner to adopt "any rules and regulations necessary or appropriate to effectuate the purposes of this section." *N.J.S.A.* 17:29A-35e.

The challenged regulation, *N.J.A.C.* 13:19-13.1, was promulgated against this backdrop and under this authority. That regulation imposes surcharges of different amounts for four distinct violations of Title 39: driving while license privileges are suspended; failure to have insurance on a motorized bicycle; failure to maintain liability insurance on a motor vehicle; and the violation involved in this case, driving unlicensed under *N.J.S.A.* 39:3-10. The summary to the proposed rule explained:

> Surcharges are levied for serious motor vehicle violations for which points are not assessed and which are not specifically dealt with in the Act. * * * The addition of these offenses reflects existing insurance industry practices because many of the violations being surcharged in the proposed new rule are currently the subject of premium increases.
>
> [16 *N.J.R.* 124 (Jan. 17, 1984).]

The statement of social impact further indicated that the rule has a beneficial social impact "by assessing surcharges for serious motor vehicle offenses [so that] those who violate the traffic safety laws [are] financially responsible for the increased costs of insurance." *Ibid.*

Thus, what emerges is the central idea that significant motor-vehicle offenses should be deemed the basis for the imposition of an insurance surcharge. Those, according to the Legislature, could include not only offenses carrying point assessments and, therefore, more often than not, traffic safety concerns, but non-point offenses, which nonetheless could be considered "serious" because they implicate driver responsibility. Consistent with that notion is the fact that subsequent to the promulgation of *N.J.A.C.* 13:19-13.1, the Legislature amended Title 39 specifically to remove the offenses of failure to sign a license and failure to notify the DMV of a name change from the coverage of *N.J.S.A.* 39:3-10 and placed them under *N.J.S.A.* 39:3-9a because those offenses are statutorily exempt from surcharges. *N.J.S.A.* 39:3-9a; *see* Senate Law, Public

Safety and Defense Committee Statement, *L.*1988, *c.* 8, *reprinted at N.J.S.A.* 39:3–9a. It thus left in place driving without a license as a motor-vehicle offense eligible for insurance-surcharge treatment. Failure to respond to an administrative regulation can constitute "an implied recognition that [it] expresses legislative meaning." *Matawan v. Monmouth County Bd. of Taxation,* 51 *N.J.* 291, 300, 240 *A.*2d 8 (1968). In this case, the Legislature's reaction to the administrative regulation, leaving the non-point offense of driving with an expired license as eligible for surcharge treatment, impliedly confirms the regulation's consistency with the enabling Act.

The Appellate Division's narrow focus on only the safety ramifications of surchargable offenses misperceives the broader goals of the Insurance Reform Act. Although motorists who have committed offenses triggering surcharges are sometimes referred to as "bad drivers," such a description could include irresponsible drivers as well. That conclusion can be inferred when the current scheme is viewed in light of the extensive inequities built into the predecessor Assigned Risk Plan that the legislation sought to correct. Thus, the Act is to be understood as a more general attempt to stabilize rates while concomitantly maintaining comprehensive availability. That broader objective lends meaning to the statute. *See Accountemps Div. of Robert Half of Philadelphia, Inc. v. Birch Tree Group, Ltd.,* 115 *N.J.* 614, 560 *A.*2d 663 (1989); *Waterfront Comm'n v. Mercedes–Benz,* 99 *N.J.* 402, 493 *A.*2d 504 (1985). The Legislature sought to remedy the inequity of disparate surcharges by providing assessments through the DMV, mandating a uniform scale, and vesting authority in the Commissioner to set rates and determine other surchargeable offenses.

The inclusion of non-safety-related offenses in such a scheme is neither novel nor unprecedented. Indeed, the subject rule, which enumerates four non-point surchargeable offenses, reflects "existing insurance industry practices." Prior to the Reform Act of 1982, private insurance companies regularly

levied surcharges for the offense of being an unlicensed driver, albeit in differing amounts. *See Chairman's Report, supra*, at 22. Thus, those most directly affected by the statutory and regulatory scheme—drivers and automobile insurers—might reasonably consider an unlicensed driver to be an irresponsible one and to have committed a "serious offense." A legislative judgment reflecting that experience and perception is at once unsurprising and understandable.

Accordingly, we find that *N.J.A.C.* 13:19–13.1 does not exceed the enabling legislation designed to effectuate the broader goal of financing the JUA in an evenhanded manner. The regulation includes the offense of driving under a lapsed license, driving with a suspended license, and driving without insurance. *N.J.A.C.* 13:19–13.1. Arguably, a driver committing any of those offenses could do so under circumstances not directly posing a safety threat in the actual operation of the motor vehicle. Nevertheless, in terms of the broader reaches of Title 39 to encourage driver responsibility as well as safety, the regulation strongly supports such a goal.

### III.

The judgment of the Appellate Division is reversed, and the order of the Director of the Division of Motor Vehicles reinstated.

STEIN, Justice, dissenting.

The Court upholds a regulation of the Division of Motor Vehicles (DMV), *N.J.A.C.* 13:19–13.1, that authorizes imposition of an automobile-insurance surcharge of $100 per year for three years on a driver who committed a $10 motor-vehicle infraction allegedly unrelated to safety concerns. I disagree.

Respondent had maintained a spotless driving record for almost nineteen years when she received a summons for driving on an expired license, contrary to *N.J.S.A.* 39:3–10. She pleaded guilty and paid a $10 fine, but contends that her violation

was entirely innocent. She asserts that she did not receive a renewal application from the DMV informing her that her driver's license was about to expire. She also claims that the DMV had sent such renewal applications in the past; that she, like virtually all other licensed drivers, relied on the renewal application to inform her of the impending expiration of her license; and that she was consequently unaware that the expiration had occurred. She argues that it is improper under those circumstances to require her to pay an insurance surcharge because the purpose of such surcharges is to make bad drivers fund the State's system of comprehensive insurance.

The majority sustains the regulation on the basis that it furthers the statutory policies of stabilizing insurance rates and equalizing surcharges. In my view, the Court disregards the basic statutory policy that surcharges to support the Joint Underwriting Association (JUA) are to be paid only by unsafe drivers.

Both the Assigned Risk Plan, L.1968, c. 385, and the Merit Rating Plan, N.J.S.A. 17:29A–35b, which amended it, institutionalize the actuarial considerations that account for higher rates for high-risk drivers and lower rates for low-risk drivers. As the majority states, "the *primary* objective of the JUA was to extend automobile insurance to those drivers unable to obtain it in the voluntary market." *Ante* at 650, 575 *A.*2d at 869 (emphasis added). The animating principle of both plans is that those drivers who are most likely to be involved in car accidents should pay higher insurance rates. Under the New Jersey Insurance Reform Act of 1982 (Reform Act), L.1983, c. 65, surcharges are levied against those who have accidents, N.J.S.A. 17:29A–35a, those who accumulate "points" on their driver's licenses, N.J.S.A. 17:29A–35b(1)a, and drunk drivers, N.J.S.A. 17:29A–35. Those categories of drivers clearly share the characteristic of posing a higher risk of involvement in accidents.

As the majority demonstrates, the Reform Act sought to correct inequities and inefficiencies that had become apparent in the operation of the comprehensive insurance system under the Assigned Risk Plan. Thus, the majority observes that the purpose of the Reform Act was "to reduce insurance inequities by replacing premium surcharges previously assessed by private insurance companies with the New Jersey Merit Rating Plan." *Ante* at 650, 575 *A*.2d at 869. That reform of the mechanism for implementing surcharges did no more, however, than "alter[ ] the *mode* of meeting the statutory compulsory-insurance mandate * * *." *Ante* at 650, 575 *A*.2d at 869 (emphasis added). It did not change the policy underlying the compulsory-insurance mandate, *i.e.*, that liability insurance surcharges be "assess[ed] * * * for *high risk* drivers," *ante* at 650, 575 *A*.2d at 869 (quoting *Clark v. New Jersey Div. of Motor Vehicles*, 211 *N.J.Super.* 708, 710, 512 *A*.2d 588 (App.Div.1986) (emphasis added)). Clearly, the Reform Act was intended to "make [the] automobile insurance system more equitable," *ante* at 653, 575 *A*.2d at 871 (Statement by Hon. Thomas H. Kean, *L*.1983, *c*. 65), but just as clearly, the surcharge system it instituted was reserved for "bad drivers." *Ibid.*

The Act gives the Commissioner of Insurance authority, after consultation with the DMV Director, to impose "surcharges for motor vehicle violations and convictions for which motor vehicle points are not assessed." *N.J.S.A.* 17:29A–35. That power must be exercised consistently with both the narrow amendatory purpose of the Reform Act and with the fundamental legislative theme that restricts surcharges to bad drivers.

The regulation challenged by respondent was one of several proposed by the Commissioner in 1989 pursuant to the Reform Act. See 16 *N.J.R.* 124–25. All address safety concerns. They impose surcharges for driving while suspended, for failure to maintain liability insurance on a motor vehicle or motorized bicycle, for any motor-vehicle violation resulting in a fatality, for drunk driving or refusal to submit to a chemical test in

another jurisdiction, and also for driving on an expired license. In the statement of "Social Impact" accompanying the proposed regulation, the Commissioner stated that the surcharges would apply "for serious motor vehicle offenses." *Ibid.* The recitation of the purpose of the Reform Act—"to make those who violate the traffic safety laws financially responsible for the increased costs of insurance"—emphasizes the connection between safety-related offenses and surcharges. *Ibid.* Thus, there is no indication in the regulation itself or in the material accompanying it that the Commissioner intended to include non-safety-related violations and convictions among the non-point violations and convictions for which surcharges are assessed.

The violation to which respondent pleaded guilty, driving without a license, may sometimes implicate safety concerns. Respondent does not argue otherwise. A person who never obtained a driver's license, or one who intentionally failed to renew a license to avoid revealing a change in health status, could be subjected to the surcharge under this regulation. Respondent admitted her guilt of the violation; she paid the fine. She argues only that the circumstances of her violation do not indicate that she is a "bad" or a "high risk" driver, and thus to the extent that the regulation is construed to apply to her, it is invalid.

Apparently agreeing that respondent's violation does not demonstrate that respondent is an unsafe driver, the Court speculates that the legislative purpose to impose surcharges on "bad" or "poor" drivers "could include *irresponsible* * * * drivers." *Ante* at 656, 575 *A.*2d at 873 (emphasis added). In the majority's view, a surcharge on irresponsible drivers is consistent with the Reform Act's purposes of "stabiliz[ing insurance] rates" and remedying "extensive inequities built into the predecessor Assigned Risk Plan." *Ibid.*

The majority focuses excessively on the rate-stabilizing purpose of the Reform Act and insufficiently on the underlying

purpose of the comprehensive insurance law: to make *high-risk* drivers financially responsible for the higher cost of insurance. Properly construed, the Reform Act sought to stabilize surcharge rates among *unsafe drivers*, not among all drivers. A regulation shifting some of the financial burden to drivers whose only transgression is the innocent non-renewal of a driver's license does not bear a close enough relationship to the central purpose of the legislation to survive judicial review.

In my view, the regulations implementing the Merit Rating Plan surcharges must afford a person convicted of driving without a license the opportunity to prove that the violation had no safety implications and was therefore irrelevant to the purposes of the Merit Rating Plan. If that showing is made, then the unlicensed-driver violation cannot be the basis of an insurance surcharge. The underlying regulation, *N.J.A.C.* 13:19–13.1, should be so construed. I would affirm.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For affirmance*—Justice STEIN—1.