In re Nicholas J. MARCUCCI, Debtor.

In re Anibal DeJesus, Debtor.

In re Gerald H. Hines, Debtor.

In re Anthony Grimes, Debtor.

CIV. Nos. 00 CV 0644(JBS), 00 CV 1013(JBS), 00 CV 1116(JBS), 00 CV 1492(JBS).

United States District Court, D. New Jersey.

Dec. 29, 2000.

John J. Farmer, Jr., Attorney General of New Jersey, by Steven L. Scher, Deputy Attorney General, Division of Motor Vehicles, Trenton, NJ, for appellant State of New Jersey.

Eric Clayman, Jenkins & Clayman, Haddon Heights, NJ, for appellees Marcucci, DeJesus and Hines.

William H. Oliver, Asbury Park, NJ, for appellee Grimes.

Neil J. Fogarty, Hudson County Legal Services Corp., Jersey City, NJ, for Amicus Curiae Hudson Legal Services Corp.

**OPINION**

SIMANDLE, District Judge.

■ These consolidated Chapter 13 bankruptcy appeals present a single interesting issue: whether insurance surcharges imposed upon drivers by the State of New Jersey Division of Motor Vehicles pursuant to N.J.S.A. 17:29A–35 are "excise taxes" entitled to priority status upon the filing of Chapter 13 bankruptcy. Under sections 523(a)(1)(A) [1] and 507(a)(8)(E)(ii) [2] of the Bankruptcy Code, 11 U.S.C. §§ 523(a)(1)(A) & 507(a)(8)(E)(ii), excise taxes are nondischargeable for bankruptcy purposes. The four bankruptcy courts in this District to have considered this question all concluded that the surcharges at issue are penalties, not excise taxes, and that debts owed under N.J.S.A. 17:29A–35 should be categorized as general unsecured claims subject to discharge upon completion of the debtors' Chapter 13 plans. *See generally In re DeJesus,* 243 B.R. 241 (Bankr.D.N.J.1999) (Wizmur, U.S.B.J.); *In re Marcucci,* Slip Op., 99–17406 (Bankr.D.N.J., Dec. 29, 1999) (Burns, U.S.B.J.); *In re Hines,* Order, 99–57744 (Bankr.D.N.J. Dec. 29, 1999) (Lyons, U.S.B.J.); *In re Grimes,* Order, 99–59194 (Bankr.D.N.J. Feb. 22, 2000) (Ferguson, U.S.B.J.).

The State of New Jersey appeals for an Order reversing the bankruptcy courts' rulings in these cases. This Court must construe New Jersey's statutory scheme for motor vehicle insurance surcharges and determine whether these charges are "taxes" and more specifically "excise taxes" under the Bankruptcy Code. For reasons

---

1. 11 U.S.C. § 523(a)(1)(A) provides in relevant part that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
(1) for a tax or a customs duty—
(A) of the kind and for the periods specified in section 507(a)(2) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed.

2. 11 U.S.C. § 507(a) provides in relevant part that:

(a) The following expenses and claims have priority in the following order:....
(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—....
(E) an excise tax on—
(ii) ... a transaction occurring during the three years immediately preceding the date of the filing of the petition.

now discussed, this Court finds that New Jersey's system of motor vehicle insurance surcharges does not impose an "excise tax" entitled to heightened priority upon bankruptcy, and will affirm the Orders of the bankruptcy courts.

## I. JURISDICTION, ISSUE PRESENTED, AND STANDARD OF REVIEW

■ This Court has subject matter jurisdiction to hear these consolidated appeals of final orders of bankruptcy courts pursuant to 28 U.S.C. § 158(a). The sole issue in this appeal is whether the vehicle surcharge debts owed by Nicholas J. Marcucci, Anibal DeJesus, Gerald H. Hines, and Anthony Grimes ("debtors") owed to the New Jersey Division of Motor Vehicles ("DMV") are "excise taxes" for the purposes of the bankruptcy code. Because this issue requires interpretation and application of legal statutes and principles, this Court's review is plenary. See Ram Constr. Co., Inc. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir.1984); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98 (3d Cir.1981).

## II. PROCEDURAL AND FACTUAL HISTORY

The facts in this case are not in dispute and require only a brief summary here. The debtors in the cases appealed from all filed petitions for Chapter 13 relief, listing DMV as a general unsecured creditor in their bankruptcy petition and schedules. The DMV subsequently filed a priority proof of claim, providing that the unpaid motor vehicle surcharges are "excise taxes" entitled to be paid in full as a priority claim. According to the State, the debtors became indebted to the DMV upon being convicted of one or more of the motor vehicle offenses as set forth in N.J.S.A. 17:29A–35 (driving while intoxicated and related offenses). Upon filing for Chapter 13 bankruptcy, these debtors had failed to pay off all or part of their surcharges, and proposed in their bankruptcy plans to discharge the surcharges as general unsecured debts.

DMV, a creditor in each of the consolidated cases, filed proofs of claim listing the motor vehicle surcharges assessed within three years of the Chapter 13 filings as priority claims. The surcharges assessed more than three years before the Chapter 13 filings were listed as general unsecured claims. The debtors filed objections to DMV's proofs of claim and sought to have the claims reclassified as general unsecured claims. After oral argument, in each case the bankruptcy judge sustained debtors' objections and reclassified the DMV proofs of claim from priority claims to unsecured claims. Judge Burns set forth the basis for her ruling in In re Marcucci in a comprehensive 36–page unpublished opinion, and Judge Wizmur issued an opinion in In re DeJesus published at 243 B.R. 241 (Bankr.D.N.J.1999). In the remaining cases, the bankruptcy courts simply issued orders rejecting the state's excise tax arguments for the reasons discussed in DeJesus. The State timely appealed, and this Court consolidated the four cases by Order dated June 21, 2000, and heard oral argument on November 3, 2000.

In their opinions, Judges Burns and Wizmur found that the DMV surcharges were more akin to civil penalties than excise taxes, and thus were not properly listed as priority claims. In reaching this conclusion, both courts applied a fact-driven functionality approach to determine whether the assessments were taxes as set forth by the Supreme Court in United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), City of New York v. Feiring, 313 U.S. 283, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941), and New Jersey v. Anderson, 203 U.S. 483, 27 S.Ct. 137, 51 L.Ed. 284 (1906).

The State does not contend that the bankruptcy courts chose the wrong law, but rather that they misapplied it. The State's argument here is the same as that

advanced in the bankruptcy courts; that its claims for motor vehicle surcharges are non-dischargeable in bankruptcy under § 523(a)(1)(A) and must be paid in full as provided in § 507(a)(8)(E)(ii).

## III. *DISCUSSION*

### A. *New Jersey Motor Vehicle Surcharges*

In order to determine whether New Jersey's motor vehicle surcharges are indeed "excise taxes", it is instructive to begin with a discussion of the New Jersey statutory scheme at issue here. Because the Court can little improve upon Judge Burns' thorough discussion of the history of the New Jersey DMV insurance surcharge program, the Court will quote at length from *In re Marcucci:*

> Prior to the effective date of New Jersey's Insurance Reform Act of 1982, insurance rates varied dramatically throughout the state depending on the insurance carrier's set percentage rates and on a driver's individual characteristics and the primary location of the automobile. *In re Christensen,* 95 B.R. 886, 890 (Bankr.D.N.J.1988); *State v. Bigham,* 119 N.J. 646, 652, 575 A.2d 868 (1990). Further, New Jersey drivers were often unable to obtain insurance coverage, despite a good driving record, if insuring a particular driver appeared to lack profitability for the insurance carriers in New Jersey. *In re Christensen,* 95 B.R. at 890. As the New Jersey legislature recognized, this Assigned Risk Plan, which was often the only insurance available for "high risk" drivers resulted in serious inequities. *Bigham,* 119 N.J. at 652, 575 A.2d at 871. For example, there were male drivers living in New Jersey who paid $1,795.00 per year for automobile insurance while their twin sisters living in another part of the state, with the same insurance coverage and the same good driving record, paid $245.00. *Id.* (citing *Ad Hoc Committee Report on Automobile Insurance Reform in the State of New Jersey, Chairman's Report,* 23–25 (January 3, 1979)). Under this system, an individual convicted of a drunken driving offense was subject to criminal penalties imposed by the State including fines, points on the driver's license, license suspension or revocation, or imprisonment. *In re Christensen,* 95 B.R. at 890 (citing N.J.S.A. 39:4–50 *et seq.* (West Supp. 1984–85)). The individual was further required by his or her insurance carrier to pay an insurance surcharge for a period of three years in order to compensate the carrier for the added risk imposed by the driver's history of drinking and driving. *Id.* Additionally, surcharges were imposed by private insurers on drivers in both the voluntary and residual market and were levied for motor vehicle violations in a seemingly ad hoc manner. *Id.* The Chairman of the Ad Hoc Committee explained that:

>> There are two inequities in the present surcharge system. Insurance points are levied for minor violations or accidents, and surcharges are levied haphazardly in the voluntary market. For example, some companies surcharge in the voluntary market for very minor violations and accidents, and others charge only for major violations or accidents. This creates a situation in which two drivers with the same accident and violation record might be treated very differently in terms of the amount of surcharge [insurance points] which they are required to pay.

> *Ad Hoc Committee on Automobile Insurance Reform in the State of New Jersey, Chairman's Report,* 23–24 (January 3, 1979).

> To remedy the deficiencies in New Jersey's automobile insurance system, the legislature enacted the New Jersey Insurance Reform Act of 1982 which became effective on January 1, 1983. *In re Christensen,* 95 B.R. at 890. This Act was designed to provide affordable, available and more equitable insurance

coverage for motorists throughout New Jersey. *Id.; Bigham,* 119 N.J. at 650, 575 A.2d 868; N.J.S.A. 17:29A–34 (it is the intent and purpose of this act . . . to require that automobile insurance rates charged any insured shall not exceed certain average rates, as determined in the act). Pursuant to this Act, "individual insurance companies [were] no longer allowed to collect surcharges from motorists. Instead, a driver convicted of a drunken driving offense [was] billed directly by the State's Division of Motor Vehicles (DMV) which [collected] the surcharges and then [disbursed] them to the New Jersey Automobile Full Insurance Underwriting Association (the Association) pursuant to N.J.S.A. 17:29A–35(b)(2)." *In re Christensen,* 95 B.R. at 891.

The Joint Underwriters Association (JUA) was established in 1983 pursuant to this Act to provide market rate insurance to drivers who were unable to afford the high cost of automobile insurance. *In re Kish,* 238 B.R. 271, 278 (Bankr.D.N.J.1999). Revenue for the JUA was obtained from insurance surcharges imposed under N.J.S.A. 17:29A–35(a); "residual market equalization charges" which were imposed by the Insurance Commissioner on all automobile insurance policyholders pursuant to N.J.S.A. 17:30E–8; and surcharges imposed on motorists who commit traffic offenses which result in "points" against their driver's licenses (N.J.S.A. 17:29A–35(b)(1)(a)), or who are convicted of driving while intoxicated or who refuse to submit to a breathalizer (N.J.S.A. 17:29A–35(b)(2)). *In re Adams,* 106 B.R. 811, 818 (Bankr.D.N.J.1989). Pursuant to subsequent amendments to this Act, the Insurance Commissioner was also authorized, pursuant to N.J.S.A. 17:29A–35(b)(3), to increase the dollar amount of motor vehicle surcharges on convictions, to impose surcharges for motor vehicle offenses which do not result in points on a driver's license, or to reduce the number of points for which surcharges may be imposed. *Id.; Bigham,* 119 N.J. at 650, 575 A.2d 868. The provisions of the Act gave the DMV the responsibility of assessing surcharges for high risk drivers in a uniform manner. *Clark v. New Jersey Div. of Motor Vehicles,* 211 N.J.Super. 708, 710, 512 A.2d 588 (App.Div.1986). Further, surcharges were assessed for serious motor vehicle offenses so that those who violated the traffic safety laws were financially responsible for the increased costs of insurance. *Bigham,* 119 N.J. at 655, 575 A.2d 868. The Act did not create new surcharges for motor vehicle convictions and accidents, rather, it reformed the previous surcharge system previously employed by the insurance companies. *Id.* at 654, 575 A.2d 868.

Specifically regarding motor vehicle surcharges imposed pursuant to N.J.S.A. 17:29A–35(b), the surcharges are levied by the DMV and are annually assessed for a three year period. N.J.A.C. 13:19–13.1(a). *See also* N.J.A.C. 13:19–13.2, and –12.11 (same). Any person who fails to pay the surcharges, shall have his or her license suspended by the Director of the DMV until the surcharges are paid to the DMV. N.J.S.A. 17:29A–35(b)(2); N.J.A.C. 13:19–12.1(a). The Director also has discretion to issue a certificate of debt to the Clerk of the Superior Court, identifying persons as indebted to the State of New Jersey under the Merit Rating Plan. N.J.S.A. 17:29A–35(b)(2); N.J.A.C. 13:19–12.12(a). A person whose driver's license is suspended for failing to pay an insurance surcharge, may apply to the Director of the DMV for the restoration of his or her driving privilege upon his or her agreement to satisfy the certificate of debt on an installment basis. N.J.A.C. 13:19–12.12(b). Granting such a request is within the discretion of the Director of the DMV. N.J.A.C. 13:19–12.12(b) & (c). By 1990 the JUA failed to achieve its goals and accumulated $3.3 billion of

debt in unpaid claims and other losses. *State Farm Mutual Automobile Ins. Co. v. State*, 124 N.J. 32, 42, 590 A.2d 191 (1991).

On March 12, 1990, the New Jersey legislature enacted the Fair Automobile Insurance Reform Act (FAIR Act). N.J.S.A. 17:33B–1. The FAIR Act was designed to reduce insurance costs for New Jersey drivers, transfer drivers insured by the JUA to the private market, and provide a mechanism to pay off the JUA debt. N.J.S.A. 17:33B–1 to 17:33B–63; *In re Kish*, 238 B.R. at 279. The Market Transition Facility (MTF) was established to phase out the JUA. *Id.* A non lapsing fund within New Jersey's General Treasury, the New Jersey Automobile Insurance Guaranty Fund (NJAIG), was created to satisfy the financial obligations of the JUA. *Id.;* N.J.S.A. 17:33B–5(a) & (d). Surcharges collected by the DMV pursuant to N.J.S.A. 17:29A–35, monies derived from other sources specified in N.J.S.A. 17:33B–5(b), and funds borrowed from the New Jersey Property–Liability Insurance Guaranty Association (PLIGA) were placed in the NJAIG fund. *In re Kish*, 238 B.R. at 279; *see also New Jersey State Bar Association v. Berman*, 259 N.J.Super. 137, 143, 611 A.2d 1119 (App.Div.1992) (citing *State Farm Mut. Auto. Ins. Co.*, 124 N.J. at 43, 590 A.2d 191) (The JUA debt was to be paid off through a variety of funding sources, including surcharges for motor vehicle violations, additional assessments and surtaxes on insurers, increased vehicle registration fees, surcharges on automobile insurance premiums and assessment of fees on attorneys, physicians, chiropractors, physical therapist and automobile body repair facilities).

Pursuant to the FAIR Act, the MTF issued insurance policies during the transition of insured drivers to the voluntary market from October 1, 1990 to September 30, 1992. *In re Kish*, 238 B.R. at 279. Like the JUA, however, the MTF also failed to achieve its goals and incurred significant liabilities. *Id.*

On June 29, 1994, the Good Driver Protection Act (GDPA) was enacted to pay claims against the MTF. N.J.S.A. 34:1B–21.1 to –21.15. The GDPA is funded by MTF member insurers, the sale of MTF bonds, and assessments paid by members of PLIGA. *In re Kish*, 238 B.R. at 279. The bonds, the sale of which is authorized by N.J.S.A. 34:1B–21.4 are funded by a DMV Fund comprised of monies transferred from the MTF and monies designated for the DMV Fund pursuant to N.J.S.A. 17:29A–35(b)(2). *Id.;* N.J.S.A. 34:1B–21.12. The DMV Fund is managed and invested by the Division of Investment in the Department of Treasury. N.J.S.A. 34:1B–21.12.

On January 14, 1997, Governor Christine Todd Whitman issued a Reorganization Plan to transfer the responsibility for certain debt collection and receipts processing from various Divisions and Departments within New Jersey to the Department of the Treasury. N.J.S.A. 52:18A–3. The Reorganization Plan was established to more efficiently direct, administer and control the State's revenue management functions into a single organization, the Division of Revenue within the Department of the Treasury. *Id.* In particular, "[t]he functions, powers and duties assigned to the Director of the Division of Motor Vehicles in the Department of Transportation ... to bill and collect merit rating plan surcharges as well as to collect delinquent merit rating plan surcharges are continued and transferred to the Division of Revenue. The functions, powers and duties assigned to the Director of the Division of Motor Vehicles in the Department of Transportation ... to process and deposit fees, charges and penalties, including but not limited to driver license, vehicle registration and other license fees, and to collect delinquent fees and penalties, are continued and transferred to the Division of Revenue." *Id.* at ¶¶ 9

& 10. Pursuant to the Reorganization Plan, the Governor found that this consolidation will improve the State's overall ability to collect revenue and reduce receivable balances and will eliminate duplicative efforts in the area of receipts processing and debt collection. *Id.* at General Provisions.

On January 12, 1995, the Comprehensive Enforcement Program Fund went into effect. N.J.S.A. 2B:19–1 to –9. Upon the passage of this legislation, the Supreme Court of New Jersey and the Chief Justice established a Statewide comprehensive enforcement program within the Superior Court which provides for the enforcement of court orders and oversees the collection of court-ordered fines, assessments. surcharges and judgments in the civil, criminal and family divisions, the Tax Court and in certain municipal court matters. N.J.S.A. 2B:19–2(f). "The comprehensive enforcement program will provide for the collection of certain surcharges administratively imposed by the Division of Motor Vehicles." *Id.* "The Director of the Division of Motor Vehicles may refer matters of surcharges imposed administratively under the New Jersey Merit Rating Plan ... which have not been satisfied to the comprehensive enforcement program ... to be reduced to judgment and for such additional action as may be appropriate." N.J.S.A. 2B:19–6(c).

Pursuant to N.J.S.A. 2B:19–10, the Director of the DMV and the Administrative Office of the Courts shall develop procedures to refer the uncollected surcharges imposed administratively by the DMV under the Merit Rating Plan. The procedures include the total dollar amount of uncollected surcharges imposed on a driver, the number of months of delinquency, the procedures for installment payments, the interval and method of referral such as through the municipal court, notice indicating that the unpaid surcharge may be referred to the comprehensive enforcement program, and procedures for payment to the DMV of money collected and the billing and accounting methods to be used. N.J.S.A. 2B:19–10.

Throughout the history of the amendments to the New Jersey Merit Rating Plan the reasons for the imposition of the motor vehicle surcharges have not changed nor has the purpose. *See McGarrah v. State*, 268 N.J.Super. 577, 581, 634 A.2d 139 (App.Div.), *certif. denied*, 135 N.J. 469, 640 A.2d 850 (1994) ("The insurance surcharges imposed pursuant to N.J.S.A. 17:29A35(b) are modeled on those previously assessed by the private insurance industry."). Surcharges are "assessed for motor vehicle offenses which involve dangerous driving practices and driver irresponsibility." *Id.* at 581–82, 634 A.2d 139. The surcharges imposed by the DMV are based upon consideration of a driver's driving history, but payment of the surcharges relates to the future operation of a motor vehicle by that driver. *Clark*, 211 N.J.Super. at 710, 512 A.2d 588. The system sets qualifications for the offender of motor vehicle laws to continue to operate a motor vehicle in New Jersey. *Id.* at 711, 512 A.2d 588. The surcharges are remedial and civil in nature. *Id.* The surcharge system does not deprive a driver of any status, opportunity or privilege. *Id.* "Instead, the person must pay a monetary assessment in accordance with a uniform schedule for the privilege of driving on the highways. All persons in the class pay in accordance with the fixed charges for violations they have accumulated. The plan is no more or less 'punitive' in nature than the State requirements of compulsory insurance." *Id.; In re Kish*, 238 B.R. at 281 (The defendants acknowledge that the surcharges in question are civil penalties which are remedial in character ... such civil penalties are remedial and rehabilitative rather than punitive.). "[The] central idea [is] that significant motor vehicle offenses should

be deemed the basis for the imposition of an insurance surcharge." *Bigham*, 119 N.J. at 655.

*In re Marcucci*, Slip Op. at 8–16.

B. *Whether New Jersey's Motor Vehicle Surcharges Are Dischargeable Excise Taxes*

■ The Bankruptcy Code is intended to forgive debts in order to provide a fresh start to the debtor. *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). With this purpose in mind, Congress provided that "all debts which [arise] before the date of the order of relief" are discharged in bankruptcy unless a specific exception has been stated in section 523. *Ohio v. Kovacs*, 469 U.S. 274, 278, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). Exceptions to the operation of discharge are to be narrowly construed against the creditor, and liberally in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995).

■ Consistent with these principles, creditors opposing the dischargeability of a debt must carry the burden of proof that their claims fall within a statutory exception. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Thus, in order to prevail in their effort to classify DMV insurance surcharges as a priority debt, the state of New Jersey must have demonstrated in the bankruptcy courts, by a preponderance of the evidence, that the insurance surcharges are excepted from discharge because they are excise taxes within the meaning of 11 U.S.C. §§ 523(a)(1)(A) & 507(a)(8)(E)(ii).

### 1. *Definition of "Taxes"*

■ At the outset, the Court considers whether the subject insurance discharges might be classified as taxes. Because federal law preempts all state law touching upon bankruptcy, federal law defines "taxes" for the purpose of the Bankruptcy Code. *See New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714 (4th Cir.1989). Because this case deals with a claim by a state government concerning a charge created by that government, however, state law determines the attributes of the government's claim. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941). The proper analysis therefore is to assess whether the attributes of the state's claim, as provided by state law, fit the definition of a tax within the meaning of the Bankruptcy Code. *See In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir.1991).

■ In cases where the Supreme Court has considered whether a particular exaction was a tax for bankruptcy purposes, the Court looked beyond the titular label given to the exaction and examined its actual operation. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (hereinafter *CF & I*). The analysis in such cases turned on the effects of the subject exaction instead of the label placed upon the exaction by the state legislature. *Id.*, 518 U.S. at 220, 116 S.Ct. 2106. *See also United States v. Sotelo*, 436 U.S. 268, 275, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978).

■ Taxes are generally defined as "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Feiring*, 313 U.S. at 285, 61 S.Ct. 1028. *See also New Jersey v. Anderson*, 203 U.S. 483, 492, 27 S.Ct. 137, 51 L.Ed. 284 (1906). The Supreme Court's recent decision in *CF & I* further refines the definition of tax as defined in *Feiring* and *Anderson*. In *CF & I*, the Court's approach to determining whether a particular state exaction was a tax focused on (1) determining whether the exaction meets the general description of a tax and (2) whether it possesses other "tax charac-

teristics" such that the exaction operates as a tax (as distinct from a debt or penalty) for the purpose of setting the priority of a claim under the bankruptcy laws. *CF & I*, 518 U.S. at 220, 116 S.Ct. 2106; *Workers' Comp. Tr. Fund v. Saunders*, 234 B.R. 555, 563 (D.Mass.1999).

The *CF & I* Court emphasized the distinction between a penalty and a neutral exaction, stating "a tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act." *CF & I*, 518 U.S. at 224, 116 S.Ct. 2106. The Court went on to note that "if the concept of penalty means anything, it means punishment for an unlawful act or commission." *Id.* When an exaction evinces a patently punitive function, it must be treated as imposing a penalty, not authorizing a tax. *Id.* at 226, 116 S.Ct. 2106. Nonetheless, an exaction which has a deterrent effect does not necessarily make the exaction a penalty. *See Sonzinsky v. United States*, 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772 (1937).

The *CF & I* Court's emphasis on the importance of distinguishing between penalties and neutral exactions stands in contrast to the framework used by the Ninth Circuit Court of Appeals in its 1982 decision *In re Lorber*, 675 F.2d 1062 (9th Cir.1982), a case prominently cited by the appellant. The *Lorber* Court defined a tax for bankruptcy purposes as:

(a) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(b) imposed by, or under authority of the legislature;

(c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it.

*Id.* at 1066–67. This test has been criticized as too broad, inasmuch as it does not adequately delineate between penalties and neutral exactions. *See In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 341 (6th Cir.1993). As the Sixth Circuit has pointed out, the *Lorber* test would allow the government to automatically win priority for all money debts owed to it regardless of the nature of the payment, whether a penalty or not. *Id.* Other Courts have voiced similar concerns. *See New Neighborhoods, Inc.*, 886 F.2d 714; *In re Park*, 212 B.R. 430, 433–35 (Bankr.D.Mass.1997). *Lorber* is further weakened by the fact that the Supreme Court in *CF & I* provided for a more rigorous analysis of what constitutes a tax, and did not refer to the *Lorber* decision nor any of the decisions which followed it.

Because it appears that the Supreme Court has declined to adopt the reasoning employed in *Lorber*, and because of the valid concerns voiced by other Courts about the *Lorber* test's overbreadth, this Court declines to follow *Lorber* in deciding whether the subject surcharges are taxes for bankruptcy purposes.

Under the reasoning of *CF & I*, the requisite analysis is whether the exaction is more like a penalty or more like a tax. That is, it must be determined whether the surcharges at issue evince more tax features than non-tax features. This analysis is necessarily muddled because of the overlap between the two categories. If an exaction is labeled a sanction, a fine, or a forfeiture, it can more readily be classified as a penalty and thus not a tax motivated primarily by revenue raising concerns. *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 778, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). However, even if a tax is imposed upon a subclass of taxpayers rather than the public in general, this does not necessarily mean that the exaction is a penalty. *See e.g. In re Hardee*, 137 F.3d 337, 342 (5th Cir.1998) (the increased interest for a period of two years imposed on underpaying taxpayers is interest and not a penalty). An exaction also may remain a "flat rate" which has fewer characteristics of a

penalty. *See In re Juvenile Shoe Corp. of America*, 99 F.3d 898, 902 (8th Cir.1996).

The state urges the Court to consider the similarities between the DMV surcharge system and workers' compensation payments, which have been classified as non-dischargeable priority taxes for bankruptcy purposes. *See Saunders*, 234 B.R. at 562. The surcharge system at issue here is plainly different from the workers' compensation scheme. The workers' compensation program centralizes the provision of insurance covering work-related injury, mandates that all employers purchase insurance from the state, and forces *all* employers to participate. *Id.* In contrast to the workers' compensation scheme, the DMV surcharge plan is not centralized, does not require that drivers purchase a service or commodity from the state, and does not mandate that *all* drivers participate, but only demands payment from those drivers having been convicted of certain motor vehicle violations. A surcharged individual does not receive insurance in return for the payments, nor does he or she receive any state-related benefit. Indeed, a person against whom a DMV surcharge is assessed need not reside in New Jersey, have New Jersey insurance, or drive in New Jersey, thus lessening the surcharge system's similarity to workers' compensation, which confers a benefit in return for an exaction. *Accord In re Marcucci*, Slip Op. at 26.

In contrast to a neutral tax, the surcharge system is designed to deter poor driving habits. As discussed above, the legislative history of the Insurance Reform Act implies that the surcharges are intended to penalize "bad drivers". *See In re Adams*, 106 B.R. at 817–18. That the surcharge system requires payment of outstanding surcharges before allowing a driver to return to the roadways should not be confused with a general tax imposed upon all drivers for the privilege of driving. *Id.* As Judge Burns observed, "a motor vehicle surcharge is not a generic exaction imposed to raise revenue for the government, but a penalty imposed as a result of specific motor vehicle violations. The State merely appropriates the monies obtained from specifically established assessments to fund the Merit Rating Plan." *Id.*

Applying the principles of *CF & I* to the case at hand, it is apparent that the subject DMV surcharges are closer to penalties than neutral assessments. Despite the legislature's use of the label "surcharge", the state has failed its burden of showing that the DMV surcharge system is a tax within the meaning of the Bankruptcy Code. Instead, it is manifest that the surcharges are civil penalties imposed as a result of violating New Jersey's motor vehicle laws. *See In re Kish*, 238 B.R. at 287.

The surcharges do possess certain tax-like characteristics. Among these are (1) that the surcharges are mandatorily imposed on the class of persons who meet the prerequisites set forth in N.J.S.A. 17:29A–35(b) without the person's consent, (2) the amount of the surcharge is fixed by that same section, and (3) all persons who meet the prerequisites set forth in that statute must pay the surcharge. It is also true that the monies collected from the surcharges are used to fund the Merit Rating Plan and the FAIR Act discussed above in Part III.A. Nevertheless, these tax-like characteristics are outweighed by the surcharge system's primary purpose of penalizing drivers who transgress the motor vehicle code.

There is nothing in the record before the Court to suggest that when the State took over the surcharge system from private insurers, it somehow transfigured the reason for the surcharges from being a penalty for violating the motor vehicle laws. To the contrary, the Merit Rating Plan, did " 'not create new surcharges for motor vehicle convictions and accidents; it reform[ed] the surcharge system previously used by the insurance companies.' " *Bigham*, 119 N.J. at 654, 575 A.2d 868 (quot-

ing Karcher, *Overview of No Fault Insurance, 111 New Jersey Lawyer* 9 (May 1985)). *See also McGarrah*, 268 N.J.Super. at 581, 634 A.2d 139. Moreover, it matters little that the surcharge system is used to help fund the Merit Rating Plan. The legislature created a multitude of funding sources for that plan, and the surcharge system is merely one source among many. *See Berman*, 259 N.J.Super. at 144, 611 A.2d 1119. That surcharges contribute to the maintenance of the Merit Rating Plan does not override the traditional role of surcharges as a means of penalizing drivers for accidents and dangerous driving practices. *McGarrah*, 268 N.J.Super. at 581–82, 634 A.2d 139 (surcharges are assessed for motor vehicle offenses). *See also, Clark*, 211 N.J.Super. at 711, 512 A.2d 588 (surcharges are a system of "civil penalties"); *In re Kish*, 238 B.R. at 284 (surcharges are civil penalties).

In sum, because the DMV surcharges operate as a penalty for violating New Jersey's motor vehicle laws, they do not operate as a "tax" within the meaning of the Bankruptcy Code as explained by the Court in *CF & I*. The state has failed to meet its burden of demonstrating that it established in the Bankruptcy Courts by a preponderance of the evidence that the DMV surcharges operate as a tax as distinct from a debt or a penalty. The surcharges are not enforced contributions for the support of the government, but rather are exactions imposed by statute as a penalty for violating certain motor vehicle laws.[3]

### 2. Definition of "Excise Tax"

Even if the subject surcharges are taxes for bankruptcy purposes, they would not qualify as "excise taxes" entitled to priority under § 507(a)(8)(E).

As discussed above, exceptions to discharge are construed liberally in favor of the debtor and strictly as against the creditor. The term excise tax is not defined by the Bankruptcy Code, thus the Court must look to other sources for its meaning. *Black's* defines an "excise" as a "tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." *Black's Law Dictionary* at 585 (7th ed.1999). Caselaw provides consistent definitions. *See e.g. Patton v. Brady*, 184 U.S. 608, 22 S.Ct. 493, 46 L.Ed. 713 (1902) (excise is "levied sometimes upon the consumption of a commodity, sometimes upon the retail sale of it, and sometimes upon the manufacture of it"); *New Neighborhoods, Inc.*, 886 F.2d at 719 (excise tax is an indirect tax, one not directly imposed upon persons or property and one that is imposed on the performance of an act, the engaging in of an occupation, or the enjoyment of a privilege). Excise taxes have traditionally been imposed on alcohol, tobacco, fuel, and luxuries and include sales taxes, estate and gift taxes, wagering and truck taxes. *In re Park*, 212 B.R. at 434. They are privilege taxes that arise upon a voluntary action of the person taxed and

---

**3.** This Court is aware of the Fourth Circuit's decision to the contrary based on Virginia law. In *Williams v. Motley*, 925 F.2d 741 (4th Cir.1991), the Fourth Circuit Court of Appeals considered the dischargeability of a debt accrued under Virginia's uninsured motorist insurance (UIM) system. When the debtor in *Williams* failed to show proof of liability insurance, the Virginia DMV suspended her driver's license and imposed an UIM vehicle assessment against her. Monies so collected were distributed among the insurance companies that provide liability coverage in Virginia. The Fourth Circuit determined that assessments collected pursuant to that scheme were indeed intended to fund UIM coverage, and thus such assessments were excise taxes within the meaning of 11 U.S.C. § 507(a)(8)(E).

In contrast to the Virginia UIM insurance system, the surcharges in this case are not imposed with the intent to fund a larger statutory scheme. Although they do fund the Merit Rating Plan, that is only an ancillary effect. As discussed above, New Jersey's DMV surcharges are primarily intended to punish those who break the law, and thus are distinct from the UIM assessments under the Virginia UIM scheme discussed in *Williams*.

lack an element of absolute and unavoidable demand. *Id.*

  Regardless of what definition is used, the subject DMV surcharges are not "excise taxes". This is not a case involving the manufacture, sale or use of goods, the enjoyment of a privilege, nor an occupation or activity license fee. The surcharges are imposed whether or not the driver intends to resume using New Jersey's roadways, and thus the surcharges are not assessed for exercising the privilege of driving in New Jersey. These assessments must be paid unavoidably and without fail by anyone violating relevant provisions of the motor vehicle code.

Based on the foregoing, the Court finds that the DMV surcharges are civil penalties that bear no similarity to traditional excise assessments such as gasoline, cigarette, or sales taxes. Rather than a revenue raising device, the surcharge system is intended to regulate drivers' conduct, and must be treated as a penalty, not an excise tax under 11 U.S.C. § 507(a)(8)(E). That the money raised is later remitted to the JUA or other public funds does not change the primary purpose of the surcharges to penalize serious violations of the motor vehicle code. The Court finds that the motor vehicle surcharges at issue are not excise taxes within the meaning of 11 U.S.C. § 507(a)(8)(E) and will in each of these consolidated cases affirm the Bankruptcy Court's determination that the surcharges are not non-dischargeable under § 523(a)(1).

## CONCLUSION

For the foregoing reasons, the Court concludes that the motor vehicle surcharges provided for in N.J.S.A. 17:29A–35 are not "excise taxes" entitled to priority status upon the filing of Chapter 13 bankruptcy under sections 523(a)(1)(A) and 507(a)(8)(E)(ii) of the Bankruptcy Code, 11 U.S.C. §§ 523(a)(1)(A) & 507(a)(8)(E)(ii). Accordingly, the Court will affirm the indi-vidual Orders of the Bankruptcy Courts in these consolidated cases.